## BASS v. COMMISSIONER OF INTERNAL REVENUE.

### No. 3769.

Circuit Court of Appeals, First Circuit.

June 24, 1942.

---

302

Edward C. Thayer, of Boston, Mass., and Erwin N. Griswold, of Cambridge, Mass. (E. Barton Chapin, of Boston, Mass., on the brief), for petitioner.

Samuel H. Levy, Sp. Asst. to the Atty. Gen., and J. P. Wenchel, Chief Counsel, and Claude R. Marshall, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C. (Samuel O. Clark, Jr., Asst. Atty. Gen., and Sewall Key and Gerald L. Wallace, Sp. Assts. to the Atty. Gen., on the brief), for Commissioner.

Before MAGRUDER, MAHONEY, and WOODBURY, Circuit Judges.

MAGRUDER, Circuit Judge.

Edith B. Bass, petitioner herein, brings for review a decision of the Board of Tax Appeals upholding the Commissioner's determination that there is a deficiency of $150,596.51 in petitioner's income tax for the calendar year 1937. Practically the entire amount of the deficiency resulted from a ruling that an issue of preferred stock by Bird & Son, Inc. to its shareholders incident to a readjustment of the corporation's capital structure constituted a taxable stock dividend under the Revenue Act of 1936, 49 Stat. 1648. Relevant provisions of the Act are copied in the footnote.[1]

Bird & Son, Inc. was incorporated under the laws of Massachusetts in 1918, and has

---

[1] "§ 22. Gross Income

"(a) General Definition. 'Gross income' includes gains, profits, and income derived from * * * sales, or dealings in property * * * also from * * * dividends * * *."

"§ 111. Determination of Amount of, and Recognition of, Gain or Loss

"(a) Computation of gain or loss. The gain from the sale or other disposition of property shall be the excess of the amount realized therefrom over the adjusted basis provided in section 113(b) for determining gain, and the loss shall be the excess of the adjusted basis provided in such section for determining loss over the amount realized."

"§ 112. Recognition of Gain or Loss

"(a) General rule. Upon the sale or exchange of property the entire amount of the gain or loss, determined under section 111, shall be recognized, except as hereinafter provided in this section. .

"(b) Exchanges solely in kind
* * * * * *
"(2) Stock for stock of same corporation. No gain or loss shall be recognized if common stock in a corporation is exchanged solely for common stock in the same corporation, or if preferred stock in a corporation is exchanged solely for preferred stock in the same corporation.

"(3) Stock for stock on reorganization. No gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are, in pursuance of the plan of reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization.

* * * * * *
"(g) Definition of reorganization. As used in this section and section 113—

"(1) The term 'reorganization' means * * * (D) a recapitalization * * *."

"§ 115. Distributions by Corporations

"(a) Definition of dividend. The term 'dividend' when used in this title (except in section 203(a) (3) and section 207 (c) (1), relating to insurance companies) means any distribution made by a corporation to its shareholders, whether in money or in other property, (1) out of its earnings or profits accumulated after February 28, 1913, or (2) out of the earnings or profits of the taxable year (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year), without regard to the amount of the earnings and profits at the time the distribution was made.

"(b) Source of distributions. For the purposes of this Act every distribution is made out of earnings or profits to the extent thereof, and from the most recently accumulated earnings or profits. Any earnings or profits accumulated, or increase in value of property accrued, before March 1, 1913, may be distributed

been profitably engaged in the business of manufacturing and selling paper and paper products. On September 14, 1937, its authorized and outstanding capital stock consisted of 600,000 shares of common stock without par value, representing a stated capital of $6,000,000. The earned surplus, as then shown on the books, stood at the figure of $5,701,003.82. All of the stock was held in a voting trust which was to terminate on October 9, 1937. The voting trust certificates for most of the stock were held by officers and employees of the corporation and by members of the Bird family.

In anticipation of the expiration of the voting trust, consideration was given to revising the capital structure of the corporation. There was no market for the voting trust certificates and many holders thereof had requested that some arrangement be made to afford a satisfactory market on which they could sell a portion of the holdings. On May 3, 1937, the board of directors appointed a committee to consider the matter. This committee made its report on August 17, 1937. The plan which it proposed was ultimately approved and carried out.

The plan called for the authorization of an issue of 50,000 shares of cumulative preferred stock with a par value of $100 each. 30,000 of such shares, representing $3,000,000 of capital, were to be issued in place of 300,000 common shares, the common stock to be simultaneously reduced by such amount. There was further to be a split-up of the remaining 300,000 of common shares, which represented $3,000,000 of capital, on a basis of two for one; 600,000 common shares representing a stated capital of $5 each were to be issued in exchange for the said 300,000 of common shares representing a stated capital of $10 each. The remaining 20,000 shares of preferred stock were to be held in reserve, to be issued later at the discretion of the directors. Application was to be made for listing the preferred and common stock on the Boston Stock Exchange.

In all the formal steps which were duly taken by the directors and the stockholders to effectuate the plan, it was made clear that the readjustment of the capital structure was to be carried through "without any capitalization or impairment of any existing surplus or accumulated and undivided profits". As the Board specifically found, the directors "believed that $6,000,000 was a sufficient and proper capitalization for the corporation and surplus should not be changed but should be left as it was for future corporate purposes".

The plan as proposed by the committee was prompted by a desire, first, to provide marketable shares and thus to satisfy the needs of the shareholders and, second, to provide the corporation with some addi-

---

exempt from tax, after the earnings and profits accumulated after February 28, 1913, have been distributed, but any such tax-free distribution shall be applied against and reduce the adjusted basis of the stock provided in section 113.

\* \* \* \* \*

"(f) Stock dividends

"(1) General rule. A distribution made by a corporation to its shareholders in its stock or in rights to acquire its stock shall not be treated as a dividend to the extent that it does not constitute income to the shareholder within the meaning of the Sixteenth Amendment to the Constitution.

\* \* \* \* \* \*

"(g) Redemption of stock. If a corporation cancels or redeems its stock (whether or not such stock was issued as a stock dividend) at such time and in such manner as to make the distribution and cancellation or redemption in whole or in part essentially equivalent to the distribution of a taxable dividend, the amount so distributed in redemption or cancellation of the stock, to the extent that it represents a distribution of earnings or profits accumulated after February 28, 1913, shall be treated as a taxable dividend.

"(h) Effect on earnings and profits of distributions of stock. The distribution (whether before January 1, 1936, or on or after such date) to a distributee by or on behalf of a corporation of its stock or securities or stock or securities in another corporation shall not be considered a distribution of earnings or profits of any corporation—

"(1) if no gain to such distributee from the receipt of such stock or securities was recognized by law.

\* \* \* \* \* \*

"(j) Valuation of dividend. If the whole or any part of a dividend is paid to a shareholder in any medium other than money the property received other than money shall be included in gross income at its fair market value at the time as of which it becomes income to the shareholder." 26 U.S.C.A.Int.Rev.Acts, pages 825, 854, 855, 859, 868, 870, 871.

tional marketable shares which might later be sold to liquidate large bank loans theretofore incurred by one of the corporation's subsidiaries, or which might be issued as stock dividends so as to capitalize accumulated profits, if that should later prove to be desirable. It was felt that an issue of preferred stock would be more likely than the common stock to command a market price approximating its intrinsic value. The establishment of a market for the shares would tend to benefit the corporation in case it should desire later to sell the remaining 20,000 of preferred shares. It does not appear just what business reason moved the directors to propose the two-for-one split-up of the common shares.

On September 14, 1937, the Commissioner of Corporations and Taxation approved the certificate of the directors setting forth the amendment to the articles of association as duly voted by the stockholders in accordance with the plan. Thereupon the directors proceeded immediately to execute the plan. The single certificate for 600,000 shares of the outstanding common stock held by the voting trustees was surrendered and cancelled, in exchange for which there were issued in the names of the voting trustees a temporary certificate for 30,000 shares of the preferred stock and a temporary certificate for 300,000 shares of common stock without par value. In effectuation of the split-up of the common shares, this temporary certificate for 300,000 shares of common was in turn cancelled and a temporary certificate for 600,000 shares of common was issued in the names of the voting trustees. This all took place on September 15, 1937. Appropriate entries were made on the books of the corporation. The capital stock account, which on September 14, 1937, had showed a stated capital of $6,000,000 represented by 600,000 shares of common stock without par value, was changed to indicate a stated capital of $3,000,000 represented by 600,000 shares of common stock without par value and $3,000,000 represented by 30,000 shares of preferred stock with a par value of $100 per share. No entries were made in the surplus account as a result of the transactions; the earned surplus, as shown on the books, remained at $5,701,003.82.

The holders of the voting trust certificates, at the termination of the voting trust on October 9, 1937, turned in these certificates for their proportionate amounts of common and preferred stock. The petitioner, who had held voting trust certificates for 54,510 shares received in exchange therefor certificates for 54,510 shares of common stock and 2,725½ shares of preferred stock. The fair market value of the preferred stock at the time Mrs. Bass received it was agreed to be $86 per share.

It was ruled by the Commissioner that receipt by petitioner of these 2,725½ shares of preferred stock constituted income derived from a taxable stock dividend during the year 1937 in the sum of $234,393. The Board took the same view.

We assume in favor of the Government, without deciding, that where a corporation having only common stock outstanding declares a stock dividend of preferred stock, the stockholders thereby receive taxable income. It was so held in Strassburger v. Commissioner, 2 Cir., 1941, 124 F.2d 315, now pending before the Supreme Court on certiorari. But that decision is not controlling in the case at bar, because here the corporation declared no stock dividend, either avowedly or in disguised form. See Hood Rubber Co. v. Commonwealth, 1921, 238 Mass. 369, 371, 372, 131 N.E. 201. So far as we are aware, the present case and Jacob Fischer v. Commissioner, 46 B.T.A. ——, decided April 28, 1942,[2] are the only cases where the Commissioner has laid claim to tax an alleged stock dividend though there had been no capitalization of earnings. The Government's position here is not supported by any court decision.

"A stock dividend always involves a transfer of surplus (or profit) to capital stock." Graham and Katz, Accounting in Law Practice, 2d ed. 1938, § 80. As the court said in United States v. Siegel, 8 Cir., 1931, 52 F.2d 63, 65, 78 A.L.R. 672: "A stock dividend is a conversion of surplus or undivided profits into capital stock, which is distributed to stockholders in lieu of a cash dividend." Congress itself has defined the term "dividend" in § 115(a) of the Act as meaning any *distribution* made by a corporation to its shareholders, whether in money or in other property, *out of its earnings or profits.* In Eisner v. Macomber, 1920, 252 U.S. 189, 40 S.Ct. 189, 64 L.Ed. 521, 9 A.L.R. 1570, both the prevailing and the dissenting opinions recognized that within the meaning of the

---

2 See footnote 5, infra.

revenue acts the essence of a stock dividend was the segregation out of surplus account of a definite portion of the corporate earnings or profits theretofore available for dividends, the freezing of such segregated earnings as part of the permanent capital resources of the corporation by the device of capitalizing the same, and the issuance to the stockholders of additional shares of stock representing the profits so capitalized.[3] See 252 U.S. at .pages 210, 211, 220, 221, 228, 229, 40 S.Ct. at pages 194, 197, 198, 200, 201. Where the court divided was on the question whether a stock dividend was equivalent to a distribution of earnings. Compare page 211 with pages 227–229.

Whether profits are to be capitalized is not a mere matter of bookkeeping; there are important business differences according as one course or the other is pursued. If profits are capitalized by means of a stock dividend such profits are no longer available for the declaration of a dividend at the discretion of the directors but become part of the permanent capital of the corporation, thereby tending to enhance the corporation's credit. If profits are not capitalized they may be distributed as dividends some time in the future; and it would be a contradiction in terms to say there has been in any sense a "distribution" out of "earnings or profits" when such earnings have been expressly held intact in the surplus account for possible future distribution.

In the present case the directors were satisfied that there was no business need for increasing the capitalization of the corporation, and the Board so found. The corporation deliberately refrained from increasing its capital, and deliberately kept its surplus account unchanged. The business reasons which dictated the above described rearrangement of corporate structure had no relation to the existence of this surplus, and would have been equally valid even had there been no surplus in existence at the time. There is nothing in the record to warrant any suspicion that the corporation sought to make a surreptitious distribution of earnings to the shareholders in any form, direct or indirect.

Mr. Justice Brandeis, dissenting in Eisner v. Macomber, 1920, 252 U.S. 189, pages 230, 231, 40 S.Ct. 189, 202, 64 L.Ed. 521, 9 A.L.R. 1570, suggested that Congress might have constitutional power to tax as income of the stockholder his pro rata share of undistributed profits earned, even if no stock dividend representing it had been paid. He pointed out, however, that Congress has chosen to limit the income tax "to that share of the stockholder in the earnings which is, in effect, distributed by means of the stock dividend paid. In other words to render the stockholder taxable there must be both earnings made and a dividend paid." When no dividend is paid, but the shareholder receives preferred stock representing different rights and interests in the corporation in exchange for common stock theretofore held by him, this does not constitute a realization of income in the amount of the market value of the preferred shares. If this value is· in excess of the shareholder's basis of the common stock surrendered up, the gain upon such exchange might be taxed under §§ 22(a), 111 and 112(a) unless the transaction falls within § 112(b) (3), in which case the gain upon the exchange is not recognized. The Government is not here proceeding on the theory that there was a taxable gain on an exchange. Rather, it insists that there was in substance no exchange.

We think the Commissioner and the Board attached undue emphasis to the fact that after the transaction was completed

---

[3] It is possible for a corporation to pay out a taxable dividend by means of a distribution of its own stock to shareholders without increasing its stated capital. Thus the corporation might use a portion of its surplus earnings to make purchases of its own stock, and might later distribute this treasury stock to the remaining shareholders as a dividend. No increase of capital is involved, since there is merely a reissue of existing paid-up shares. Such a distribution of treasury stock would not be a stock dividend within the ordinary meaning of that term. Accepting to the full the authority of Eisner v. Macomber, 1920, 252 U.S. 189, 40 S.Ct. 189, 64 L.Ed. 521, 9 A.L.R. 1570, such a distribution would nevertheless seem to be quite clearly a distribution out of corporate earnings or profits taxable as income to the shareholders in the amount of the market value of the shares when received by the shareholders. For present purposes it is the same as if the corporation had used accumulated earnings to buy any other property—say, the stock of another corporation—and had distributed such substituted property in specie as a dividend to its shareholders.

the shareholders still had 600,000 shares of common stock, and, in addition, had received 30,000 shares of preferred stock worth $86 a share. From this it was concluded that the preferred stock must have been received as a stock dividend, and that the transaction could not have been an exchange governed by the provisions of § 112. The Board thought that the corporation had taken a "devious route" in rearranging its capital structure for no reason other than to give the transaction the semblance of an exchange and to disguise the distribution of a stock dividend. In this connection the Board said:

"The same result could have been reached, so far as this record shows, by merely issuing a certificate for 30,000 shares of preferred stock, allowing the voting trustees to retain the original certificate for 600,000 shares of no par common, and making book entries showing that 30,000 shares of preferred represented $3,000,000 of capital and the 600,000 common shares without par value had henceforth a stated value of $3,000,000. The stated value of the common stock could have been reduced without changing the certificate. All semblance of an exchange disappears if the steps taken in regard to the certificates for the common stock are disregarded."

But the explanation of the form in which the transaction was cast is found in the technical requirements of the Massachusetts corporation law. Mass.Gen.Laws (Ter. Ed.) 1932, c. 156, § 41A, authorizes a corporation having shares without par value, by vote of a majority of all its stock at a meeting duly called for the purpose, to "change such shares or any class thereof into a greater number of shares without par value, or provide for the exchange thereof pro rata for a greater number of shares without par value", without increasing the corporation's stated capital. There seems to be no other statutory provision permitting any rearrangement of the capital structure without increase or reduction of capital and the issue and surrender of shares pursuant to formal amendment of the articles of association approved by the Commissioner of Corporations and Taxation. At the argument before us the Government did not contend otherwise. It was necessary for the corporation to execute the plan of recapitalization in the form it followed, namely, increasing the capital by the provision for new preferred shares and simultaneously and correspondingly decreasing the capital by surrender and cancellation of half of the original common shares. Since § 16 of chapter 156 provides that no stock shall be issued at any time unless the cash, or the property, services or expenses for which it was authorized to be issued, "has been actually received or incurred by, or conveyed or rendered to, the corporation, or is in its possession as surplus", and since the preferred stock was not paid for by transferring earnings from surplus account to capital, the issuance of the preferred stock would have been void unless there had been surrendered up in exchange an equivalent amount of the common stock. See Teehan v. United States, D.C.D.Mass. 1928, 25 F.2d 884.

█ Even had the Massachusetts statute permitted the revision of the corporate structure in the more direct way suggested by the Board, still the transaction would not have had to be regarded as a stock dividend. Section 112 of the Revenue Act does not require an actual exchange of physical certificates. It is enough if there has been an exchange of stock; and that there would have been if the Board's suggested method of readjustment had been followed. The substance of the transaction then would have been, an exchange of 600,000 shares of non-par stock representing a capital of $6,000,000 for 30,000 shares of preferred stock representing $3,000,000 of capital and 600,000 shares of common stock representing $3,000,000 of capital, with no increase of the corporation's capital by the capitalization of earnings or profits.

█ In our opinion the transaction was a "recapitalization" within the meaning of § 112(g)(1)(D). It was no more than the "reshuffling of a capital structure within the framework of an existing corporation contemplated by the term 're-capitalization'." Helvering v. Southwest Consolidated Corp., U. S. Supreme Court, Feb. 2, 1942, 62 S.Ct. 546, 552, 86 L.Ed. ——. Art. 112(g)-2, Treasury Regulations 94, gives the issuance of preferred stock for outstanding common stock as an example of a recapitalization and therefore a reorganization.[4] See Elmer W. Hartzel

---

[4] This is in no way inconsistent with § 112(b) (2). The implication of that subsection is that it does not cover an exchange of common for preferred or of preferred for common. But § 112(b) (2) does not require that an exchange must

v. Commissioner, 1939, 40 B.T.A. 492, 499, 501, acquiesced in by the Commissioner, 1939-2 Cum.Bull. 16. This regulation would have fitted the case at bar like a glove if the corporation had omitted the second step in the transaction, that is, the two-for-one split-up of the common shares remaining in the shareholders' hands after they had surrendered up 300,000 shares of common for 30,000 shares of preferred. This second step might have been omitted without detriment to the essential purpose of the reorganization. The fact that it was deemed convenient to have $3,000,000 of capital represented by 600,000 common shares instead of by 300,000 common shares did not render the first step any less a genuine exchange of common stock for preferred in pursuance of a plan of reorganization (recapitalization) within the meaning of § 112(b)(3). Suppose the steps had been taken in the reverse order, and with an interval of time between. For instance, in May, 1937, there might have been a two-for-one split-up so as to have the $6,000,000 of stated capital represented by 1,200,000 shares of common instead of by 600,000 shares of common. The receipt of such additional shares by way of split-up admittedly would have been non-taxable. See § 112(b)(2). Then suppose that in September, 1937, the corporation had de-cided to issue 30,000 preferred shares of a par value of $3,000,000 in exchange for 600,000 shares of common, with no increase of capital. This would certainly have been a non-taxable exchange within § 112(b)(3); and hence the preferred stock would not have represented a taxable dividend to the shareholders within the meaning of § 115(a) and § 115(f)(1). Jacob Fischer v. Commissioner, 46 B.T.A. ——, decided April 28, 1942, a decision hardly reconcilable with that of the Board in the case at bar.[5] See also § 115(h)(1). We cannot see what difference it makes in the case at bar that the two steps were taken simultaneously as part of a single plan of reorganization.[6]

If the corporation had not had accumulated earnings available for dividends on September 15, 1937, the Government of course could not have made the contention that the issuance of preferred stock on that date constituted a stock dividend, nor could it have been doubted that the execution of the plan of recapitalization would have been a tax-free exchange within § 112(b)(3) in which neither gain nor loss would have been recognized. But the Board's view is that the mere existence of such accumulated earnings converted the transaction, for income tax purposes, into a taxable stock

---

be in pursuance of a plan of reorganization, which distinguishes it from § 112(b)(3). If A owns common stock and B preferred stock in the X corporation and they exchange their securities, gain or loss upon the exchange will be recognized because the exchange is not pursuant to a plan of reorganization within § 112(b)(3), nor is it the kind of exchange described in § 112(b)(2). In view of the difference in scope of the two subsections there is no reason to read into § 112(b)(2) the implication that the issuance of preferred stock for outstanding common stock should not be deemed a "recapitalization" within the meaning of § 112(b)(3).

[5] In Jacob Fischer v. Commissioner the corporation had outstanding an issue of 7,000 shares of common of a par value of $100 per share, or $700,000. During 1936 a plan of recapitalization was duly executed under which the corporation's charter was amended so that, instead of its outstanding stock, its authorized stock would consist of 35,000 shares of new common of a par value of $10 per share, or $350,000, and 14,000 shares of new preferred of the par value of $25 per share, or $350,000. The corporation's capitali-zation, the amount of its surplus, and the amount of its undivided profits remained the same as before the readjustment of the capital structure. Each shareholder received 5 shares of new common and 2 shares of new preferred for the surrender of each share of old common previously held. In effect this was an exchange of 3500 old common shares for 14,000 shares of new preferred, and a simultaneous 10-for-one split-up of the remaining 3500 shares of old common. It was held that the receipt of the preferred stock was neither a stock dividend under § 115(f)(1) nor essentially equivalent to a dividend under § 115(g).

[6] If in the Fischer case referred to in the preceding footnote, the split-up had been on a two-for-one basis so that the remaining 3500 shares of old common of a par value of $100 per share were exchanged for 7,000 shares of new common at $50 a share, then the net result would have been the same as in the case at bar; after the recapitalization the shareholders would have had the same number of common shares as before and in addition would have had 14,000 shares of new preferred.

dividend, by virtue of the presumption in § 115(b), even though the corporation did not in fact capitalize any part of such earnings and, indeed, had no need for any increase of capital. As to this, the petitioner rightly observes: "From this suggestion it would have to follow that it is impossible for a corporation having any earnings to reclassify its existing capital stock without becoming involved in a dividend and that the recapitalizations permitted to be made without deterrent recognition of gain under Section 112 would frequently be subject to far more deterrent tax as on a dividend." Congress, in § 115(h)(1), seems to have provided expressly against this result. See the elaboration of this subsection in Treasury Regulations 94, Art. 115-11.[7]

■ There is no need to adopt the narrow construction of § 112 urged by the Commissioner in order to harmonize it with § 115(b).[8] The latter subsection attributes a source to distributions when distributions are made; for purposes of the Revenue Act every distribution to shareholders is deemed to be made out of earnings or profits to the extent thereof, despite the effort of the corporation to earmark such distribution as coming from some other source, such, for example, as paid-in surplus,[9] or unrealized appreciation in value of capital assets. The decisions cited by

the Commissioner as applying § 115(b) were all cases where an undoubted distribution had taken place, most of them in cash. Leland v. Commissioner, 1 Cir., 1931, 50 F.2d 523; Baker v. Commissioner, 2 Cir., 1936, 80 F.2d 813; Faris v. Helvering, 9 Cir., 1934, 71 F.2d 610; Commissioner v. Sansome, 2 Cir., 1932, 60 F.2d 931, certiorari denied Sansome v. Burnet, 287 U.S. 667, 53 S.Ct. 291, 77 L.Ed. 575; United States v. Kauffmann, 9 Cir., 1933, 62 F.2d 1045; Murchison's Estate v. Commissioner, 5 Cir., 1935, 76 F.2d 641; Walker v. Hopkins, 5 Cir., 1936, 12 F.2d 262. Section 115(b) does not, however, prescribe the criteria for determining when a distribution has taken place, as distinguished from an exchange, which is governed by § 112.

■ The Commissioner contends that there is "no more justification for treating a situation, otherwise covered by Section 115(b), as a 'recapitalization' because earnings had not been capitalized, than there would be for treating stock dividends as a 'recapitalization' when the corporation had capitalized earnings"; that the taxpayer, in order to sustain her position, "is put to the necessity of contending that all stock dividends are 'recapitalizations'." We think this argument is specious. A stock dividend may be a recapitalization, because it does involve a change of the capital struc-

---

[7] Art. 115-11 reads in part as follows: "The general rule provided in section 115(b) that every distribution is made out of earnings or profits to the extent thereof and from the most recently accumulated earnings or profits, does not apply to:

"(1) The distribution, in pursuance of a plan of reorganization, by or on behalf of a corporation a party to the reorganization, to its shareholders of stock or securities in such corporation or in another corporation a party to the reorganization—

\* \* \* \* \* \*

"(B) in any taxable year (beginning before January 1, 1936, or on or after such date) in exchange for its stock or securities (see section 112(b)(3)) if no gain to the distributees from the receipt of such stock or securities was recognized by law."

[8] The Commissioner would have been on the other side of the fence if this had been a case where Bird & Son, Inc., was claiming a dividends paid credit under § 27 of the Revenue Act of 1936, 49 Stat. 1665, 26 U.S.C.A.Int.Rev.Acts, page 837. Skenandoa Rayon Corp. v. Commissioner, 2 Cir., 1941, 122 F.2d 268.

[9] Thus, suppose 600,000 shares of common without par value had originally been issued for $10 a share and that of the $6,000,000 thus obtained, $3,000,000 had been entered on the books as stated capital and $3,000,000 as paid-in surplus. Later, the corporation purports to capitalize this paid-in surplus, and issues to the stockholders 30,000 shares of new preferred stock having a par value of $100 per share as representing this surplus so capitalized. If the corporation had on hand accumulated earnings of $6,000,000 out of which a cash or a stock dividend might have been paid, it would seem that under § 115(b) the distribution of the preferred stock, for income tax purposes, would have to be attributed to the accumulated earnings as its source rather than to the paid-in surplus account. Such, however, was not the situation in the case at bar for here there has been merely a reshuffling of the capital structure within the framework of the existing corporation, without any increase of its capital—an exchange of securities in pursuance of a plan of reorganization (recapitalization) within the meaning of § 112(b)(3).

ture, but the issuance of additional stock representing capitalized earnings does not involve an "exchange" and hence does not fall within § 112(b)(3).

Gregory v. Helvering, 1935, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596, 97 A.L.R. 1355, cited by the Board, is no authority for the position taken. There, the creation of the ephemeral new corporation was simply an operation having no business or corporate purpose—"a mere device which put on the form of a corporate reorganization as a disguise for concealing its real character, and the sole object and accomplishment of which was the consummation of a preconceived plan, not to reorganize a business or any part of a business, but to transfer a parcel of corporate shares" to the stockholders. Page 469 of 293 U.S., page 267 of 55 S.Ct., 79 L.Ed. 596, 97 A.L.R. 1355. In substance, assets of the corporation were distributed to its shareholders and the corporation's surplus was correspondingly reduced. In these circumstances the distribution was held taxable as a dividend. In the case at bar, however, there was a permanent revision of the capital structure pursuant to a plan of recapitalization having a genuine business purpose. The transaction was not a tax-dodging subterfuge. There was in fact no "distribution" out of "earnings or profits".

 It is quite true that to a certain extent the transaction in the present case had the same effect as if $3,000,000 of profits had been capitalized and 30,000 shares of preferred stock had been issued as a stock dividend; that is, in both situations the aggregate book value of each stockholder's holdings would remain unchanged, because the book value of 600,000 shares of common necessarily is reduced by an amount equal to the book value of the new 30,000 shares of preferred. Of course, the fact that there has been no increase in the aggregate wealth of the shareholders does not in itself establish that they have not received a dividend. United States v. Phellis, 1921, 257 U.S. 156, 171, 42 S.Ct. 63, 66 L.Ed. 180. On the other hand, neither does this fact establish that the stockholders *have* received a dividend. On

that issue the fact is colorless. What distinguishes the present transaction from a stock dividend is that here no portion of the surplus was capitalized.

That this is the significant distinction may be tested in another way. We are told that the Government plans to ask the Supreme Court to overrule Eisner v. Macomber, 252 U.S. 189, 40 S.Ct. 189, 64 L.Ed. 521, 9 A.L.R. 1570. Let us suppose that the Government succeeds in this endeavor. Then compare these two situations in the case of Bird & Son, Inc., having a stated capital of $6,000,000 represented by 600,000 shares of common stock without par value, and having an earned surplus at the round figure of $6,000,000: (1) The corporation, without capitalizing any of its earnings, splits up its 600,000 shares of common two for one into 1,200,000 shares of common; (2) the corporation capitalizes all the $6,000,000 profits by means of a stock dividend of 600,000 additional shares of common to the shareholders. Case (1) is admitted by the Government not to involve a taxable dividend, even though the corporation did have on hand accumulated profits out of which a dividend *might* have been declared. Yet in both cases the aggregate book value of each shareholder's holdings remains unchanged. In each case upon consummation of the transaction the shareholders have in the aggregate 1,200,000 common shares of a book value of $10 a share, in place of 600,000 common shares having a book value of $20 a share. Case (2) would be a taxable stock dividend if Eisner v. Macomber were overruled. Case (1) is concededly not taxable. The only difference is that in Case (2) there has been a transfer to capital account of the funds in the surplus account and the issuance to the stockholders of additional shares of stock representing the profits so capitalized; whereas in Case (1) the accumulated earnings remain intact, available for future dividend distributions. The latter is the fact in the case at bar, and, we think, the controlling fact.

The decision of the Board of Tax Appeals is vacated and the case is remanded to the Board for further proceedings not inconsistent with this opinion.