## RIDDLESBARGER v. COMMISSIONER OF INTERNAL REVENUE.

### No. 10572.

United States Court of Appeals
Seventh Circuit.

Nov. 17, 1952.

Tom Leeming, Timothy G. Lowry, Gerhard E. Seidel and Eckert, Peterson & Leeming, Chicago, Ill., for appellant, Rufus Riddlesbarger, Elroy C. Sandquist, Jr., Chicago, Ill., of counsel.

Charles S. Lyon, Acting Asst. Atty. Gen., Hilbert P. Zarky, Sp. Asst. to Atty. Gen., Ellis N. Slack, Acting Asst. Atty. Gen., for respondent.

Before MAJOR, Chief Judge, and DUFFY and LINDLEY, Circuit Judges.

MAJOR, Chief Judge.

The Tax Court of the United States determined income and victory tax deficiencies against Rufus Riddlesbarger in the amount of $79,479.17, for the year 1943. The case is here on petition by Riddlesbarger (hereinafter referred to as the taxpayer or the petitioner) to review that decision. Subsequently, a more detailed statement of the facts will be made but presently, for the purpose of immediately bringing into focus the issues involved, a brief summary will suffice.

Lanteen Laboratories, Inc. (hereinafter referred to as the parent or parent company) was organized in 1928 under the laws of Illinois, for the primary purpose of manufacturing and selling pharmaceutical and allied products. Lanteen Medical Laboratories, Inc. (hereinafter referred to as the subsidiary or subsidiary company) was organized in 1934 under the laws of Delaware, for the same purpose. Both companies maintain their principal offices in Chicago, Illinois. Petitioner at all times relevant to this proceeding owned more than 90% of the stock in the parent, and the latter all of the stock in the subsidiary. The subsidiary company, in 1937 and 1938, purchased real estate in the State of Arizona (sometimes referred to as the Arizona ranch or ranch property). In contemplation of a plan of corporate reorganization, the subsidiary on November 9, 1942, declared and paid a dividend, consisting of the ranch property, to the parent company. The latter in its Federal income tax return for that year reported the receipt of such dividend in kind of the value of $147,159.38, computed and paid tax accordingly.

As a step in the contemplated plan of reorganization, Lanteen Realty Company, a corporation (sometimes referred to as Realty), was organized under the laws of Illinois, for the purpose, among others, of dealing in real property, to erect buildings thereon and to acquire and deal in livestock and personal property. On November 19, 1942, the ranch property was conveyed to Realty in full payment for 2,312 shares of its Common Stock subscribed to by the parent company. The plan of reorganization also encompassed a recapitalization of the parent company, by which new stock issued pursuant thereto, as well as the stock received from Realty in payment for the ranch property, would be exchanged with the stockholders of the parent company for old stock held by them. As a result of such exchange, petitioner received from the parent company 2,177 shares of Realty Common Stock and $50.00 cash, valued by the Tax Court at $109,328.94.

The Tax Court decided that the exchange in controversy resulted in petitioner receiving a taxable distribution of dividends from the parent company in 1942, in the amount of $109,328.94, which occasioned the deficiency here sought to be expunged. Petitioner and Commissioner appear to agree upon the issues for decision, (1) whether the reorganization of the parent company was such a compliance with Sec. 112(b) (3) of the Internal Revenue Code, Title 26 U.S.C.A. § 112(b) (3), as to entitle petitioner to its benefit, and (2) whether the stock of Realty received by petitioner was a corporate distribution constituting a dividend under Sec. 115(a) and (g) of the same Code. Both issues were decided by the Tax Court adversely to petitioner. Obviously, if petitioner was entitled to the benefit of Sec. 112(b) (3), a tax-free exchange resulted and the deficiency was improperly determined. No question is raised here as to the determination by the Tax Court of the value of the Realty stock received by petitioner.

There is no serious dispute as to the evidentiary facts because they were in the main, so far as material to any issue raised here, stipulated. Many facts are recited in the briefs of the respective parties, as well

as in the decision of the Tax Court, which in our view throw little if any light upon the questions for decision. The parent company has since the organization of the subsidiary been only a sales outlet for the products manufactured and produced by the subsidiary, and then only for the State of Illinois. Petitioner actively participated in the operation of the parent and subsidiary and was the dominant and controlling personality in their affairs. As noted, he owned more than 90% of the stock of the parent, although there were 36 other stockholders, and served as its president. As controlling stockholder of the parent company, he selected the officers and directors of both companies and determined when new products were to be manufactured.

In about 1936, the subsidiary company began experiments and research in hormones with a view ultimately to manufacturing as one of its products a preparation embodying natural hormones. The most feasible source of estrogenic hormones is the urine of pregnant mares. Raw material for experimental quantities was difficult to obtain and it was decided by the subsidiary company that it should, like some of its competitors, own a farm from which the raw material might be obtained. It was this decision which led to the purchase of the Arizona ranch, first of 2,400 acres in 1937, which was subsequently increased by the purchase of an additional 160 acres. The ranch when purchased was improved, but commencing about the middle of 1938, the subsidiary company made extensive improvements and acquired equipment and livestock, including at one time more than 100 horses.[1] Petitioner supervised the ranch operation and, beginning in May 1939, lived on the ranch, paying rent to the subsidiary company.

The operations of the ranch property resulted in a net loss for each of the years as follows:

| Year | Loss |
| --- | --- |
| 1938 | $13,863.26 |
| 1939 | 13,109.82 |
| 1940 | 7,800.56 |
| 1941 | 14,281.65 |
| 1942 | 37,722.76 |

In view of the Commissioner's argument that "there has not been a sound business reason for the acquisition in the first instance" of the ranch property and that "the taxpayer does not contend that Realty was supposed to or did conduct any active business with the ranch" (the taxpayer contends just the opposite), this appears to be an appropriate point, even though somewhat out of sequence, to relate the facts relative thereto.

There was a dispute between the Commissioner and the subsidiary company concerning the latter's income tax returns for the years 1939 and 1940. This dispute was settled administratively on June 3, 1942. The net losses of the subsidiary company from operations of the ranch property for 1941 and 1942, in the amounts set forth above, were reflected in the income tax returns of the company for those years. The net losses were disallowed by the Commissioner upon his contention that the ranch property was operated for the personal convenience or accommodation of Riddlesbarger. The issue was submitted to the Tax Court in the case previously referred to (10 T.C. 279), wherein it was determined (a) that net losses were deductible to the extent of $6,481.65 in 1941, and $31,722.76 in 1942, and to that extent they represented business losses, and (b) that the balance of the net losses, that is, $7,800.00 for 1941, and $6,000.00 for 1942, were not deductible because they represented expenditures inuring primarily to the benefit of Riddlesbarger. Thus, it will be noted that for the significant year of 1942, the Tax Court determined that about 85% of the losses were attributable to business expenditures and about 15% to expenditures primarily for the benefit of Riddlesbarger. Further, the Tax Court in that case stated, 10 T.C. at page 288:

"The evidence convinces us that one of the purposes in the acquisition of

1. In Lanteen Medical Laboratories, Inc. v. Commissioner, 10 T.C. 279, will be found a detailed statement of the facts relative to the purchase and development of the Arizona property. It is stipulated in the instant proceeding that the decision in that case may be considered here.

the ranch was to obtain a source of supply for the hormone raw material, with the expectation of eventually engaging in the manufacture and sale of hormone preparations. * * * So, we think that whatever expenses were proximately or directly related to the hormone project should be deductible as ordinary and necessary business expenses."

Relative to the business activity of Realty, the Tax Court in the instant case found:

"During the years 1942 to 1946, Realty owned and operated the ranch and maintained thereon 100 head of cows. This number was steadily decreased to about 50 during the last two or three years. One part-time cow hand was employed thereon. Realty engaged in no other business activity. Petitioner spent about six months a year supervising the operation of the ranch."

As shown, the subsidiary company sustained a substantial net loss for each of the years it operated the ranch. We omit a detailed statement of the reasons for such losses. It is sufficient to quote again the Tax Court in the previous proceeding, 10 T.C. at page 289:

"It is true, of course, that the petitioner's hormone project did not meet with the anticipated success. But the failure to realize the hopes therefor is sufficiently explained by the difficulties which petitioner met in the course of the project—among them the patent complications and particularly the advent on the market of a synthetic product which was much cheaper."

In 1941, petitioner decided that the efforts to manufacture hormones from the raw materials supplied by the ranch should be abandoned and that the ranch property should be used for the production of beef cattle. The horses were sold and beef cattle were acquired. Petitioner in the instant proceeding testified:

"Well, in brief, I was disappointed and quite unhappy with the course of events that occurred in reference to our production of hormones, and when I became satisfied that that was not go-ing to be practical or profitable I then realized that the entire picture regarding that ranch was different than it had been previously, and when we abandoned the production of hormones it left that ranch as an operation that was entirely foreign to our pharmaceutical business in Chicago, and I felt it was only sound business to separate those two bodies of assets, one from the other."

In July 1942, petitioner commenced discussions with Walter H. Eckert, of Eckert & Peterson (attorneys for the parent and subsidiary companies), and John D. Filson, of George Rossiter & Company (certified public accountants for the companies), concerning the means to be employed in segregating the ranch property from the other assets of the pharmaceutical business. The separation of the properties, the creation of a building corporation and the recapitalization of the parent company were the subjects of correspondence and conferences between petitioner and his accounting adviser, Filson, from August to November, 1942. We think it unnecessary to set forth in lengthy detail the various proposals which were considered relative to petitioner's objective. It is sufficient to note that tax consequences incident to any plan adopted were given thorough consideration. Petitioner testified, however, that such consequences were not a motivating factor in his determination to separate the ranch property and the pharmaceutical business.

Petitioner followed the advice of his lawyer and accountant on the method to be utilized. The final suggestion made by Filson, which was later in effect adopted, was as follows:

"Lanteen Medical Laboratories, Inc., [Subsidiary] shall declare and pay a dividend on its common stock in kind, payable by transfer of the Arizona ranch property to Lanteen Laboratories, Inc., [Parent] its majority stockholder. Lanteen Laboratories, Inc., will then reorganize and recapitalize, by reclassifying its capital stocks and forming a new corporation [Realty] to which the ranch properties will be transferred solely in exchange for

stock or securities of the new corporation. The reclassified capital stocks and the capital stock of the new corporation formed to hold title to the ranch properties will be distributed to the present stockholders of Lanteen Laboratories, Inc., in exchange for their present holdings of Lanteen stock. This recapitalization and reorganization and the consequent exchanges by the present stockholders of existing stock for new stock and stock of the new corporation, will constitute a 'reorganization' within the meaning of Section 112(g) of the Code and nontaxable exchanges under the provisions of Section 112(b) of the Code."

As already noted, the dividend was declared by the subsidiary and its receipt was reported in the income tax return of the parent company for 1942, in the amount of $147,159.38. Further as already noted, Realty was issued a certificate of incorporation by the Secretary of State of the State of Illinois, dated November 17, 1942. Realty received the ranch property on November 19, 1942, in full payment for 2,312 shares of its Common Stock subscribed to by the parent company. The only additional shares issued by Realty were three directors' qualifying shares for $150.00 each.

Prior to November 1942, the authorized capitalization of the parent company consisted of 200 shares Preferred Stock with no par value, 10,000 shares Class A Common Stock par value $50 a share, and 50,-000 shares Class B Common Stock with no par value but with a stated value of $5 per share. The Preferred Stock was entitled to cumulative preferred dividends of $8 a share per annum, and upon dissolution of the corporation the Preferred Stock was to receive $100 per share from the net assets of the parent company plus all accrued and unpaid dividends. The Class A Common Stock was entitled to dividends of $4 a share per annum after provision for the Preferred Stock dividends, and upon dissolution of the parent company the Class A Common Stock was to receive $50 per share from the net assets of the parent company, plus all declared and unpaid divi-

dends after provision for the $100 per share to which the Preferred Stock was entitled. The Class B Common Stock was entitled to dividends of $4 a share per annum after provision for the Preferred Stock dividends and the Class A Common Stock dividends, and upon dissolution of the parent company the Class B Common Stock was to receive all remaining net assets of the corporation after provision for the $100 per share to which the Preferred Stock was entitled and for the $50 per share to which the Class A Common Stock was entitled. Both classes of Common Stock and the Preferred Stock were entitled to vote. In December 1942, none of said Preferred Stock was issued and outstanding, 751 shares of said Class A Common Stock were issued and outstanding (not including treasury stock), and 23,137 shares of said Class B Common Stock were issued and outstanding (not including treasury stock). The parent company had 37 stockholders, including petitioner.

A special meeting of the Board of Directors of the parent company was held on November 24, 1942, in which it was proposed that:

"(a) The parent company increase its present capitalization from 200 shares no par value $8 cumulative Preferred Stock, 10,000 shares $50 par value $4 noncumulative Class A Common Stock and 50,000 shares no par value Class B Common Stock stated value $5 a share to:

"1,000 shares Preferred Stock—Par value $50 a share; $4 per share per annum cumulative dividends; $50 per share plus accrued dividends upon dissolution of corporation; redeemable by corporation at $50 per share and accrued dividends upon 30 days' notice; corporation may purchase shares at not more than redemption price, but shares so purchased are to be cancelled and not reissued.

"10,000 shares Class A Common Stock—Par value $50 a share; $4 per share per annum non-cumulative dividends; share pro rata with Class B Common Stock of dividends in addition to $4 per share per annum on Pre-

ferred Stock, Class A Common Stock and Class B Common Stock; $50 per share upon dissolution of corporation.

"50,000 shares Class B Common Stock—No par value; stated value of $5 a share; $4 per share per annum non-cumulative dividends; share pro rata with Class A Common Stock of dividends in addition to $4 per share per annum on Preferred Stock, Class A Common Stock and Class B Common Stock; remaining assets after provision for Preferred Stock and Class A Common Stock upon dissolution of corporation.

"(b) Upon recapitalization of the parent company as aforesaid each owner of one share of the old Class A Common Stock would receive at his election either one share of the new Preferred Stock or one share of the new Class A Common Stock, and each owner of ten shares of the old Class B Common Stock would receive one share of new Class A Common Stock, nine shares of new Class B Common Stock and one share of Lanteen Realty Co. Common Stock.

"(c) No certificate would be issued for fractional shares of stock, and owners of old Class B Common Stock might elect to exchange their old Class B Common Stock for new Class A Common Stock share for share or to receive cash at the rate of $50 per share for their old Class B Common Stock.

"(d) Owners of the first 5,000 shares of new Class B Common Stock who apply before January 1, 1945, would have the right to convert their new Class B Common Stock share for share for new Class A Common Stock."

The proposal was adopted by the directors of the parent company, with directions that its officers submit the same for ratification at a special meeting of the shareholders to be called for December 7, 1942, whereupon each shareholder of the parent company was mailed a notice dated November 27, 1942, signed by petitioner, which stated reasons for the reorganization. In substance, such reasons were the creation of a realty company in anticipation of the construction of a factory and office building more suitable for the use of the corporation than their existing quarters, and so that the Arizona ranch might be separated from the trade and drug operations. It was also pointed out that the reorganization permitted the transformation of Class B Common Stock into a dividend paying stock or cash, as the stockholder might prefer.

At a special meeting of the shareholders of the parent company held on December 7, 1942, the proposed plan of reorganization was ratified and approved. The minutes of this meeting also disclose a confirmation and approval of the action of the Board of Directors of the parent company in conveying the Arizona ranch to Realty in full payment for 2,312 shares of the capital stock of the latter.

746 shares of Class A Common Stock and 23,098 shares of Class B Common Stock of the parent company were surrendered, received and cancelled by that company, and 235 shares of new Preferred, 3,723 shares of new A, 19,850 shares of new B, 2,205 shares of Realty stock and $1,800 in cash were received by the shareholders of the parent in return therefor.

Petitioner surrendered 180 shares of old Class A Common Stock and 21,771 shares of old Class B Common Stock of the parent company, and received therefor 2,357 shares of new Class A Common Stock, 19,593 shares of new Class B Common Stock of the parent company, 2,177 shares of the Common Stock of Realty and $50 in cash.

The Realty stock received by petitioner in 1942 was held by him until 1946, when the assets of Realty were transferred to Western Development Company. In connection with such transfer, petitioner received 2,177 shares of the 2,303 shares of the then issued and outstanding capital stock of that company in exchange for his stock in Realty. Western Development is still in existence, in which petitioner still retains his stock interest.

As heretofore shown, Realty during the years 1942–1946 engaged in the cattle business on the Arizona ranch. During each of those years it sustained an operating loss

varying in amounts from $3,070.16 in 1942, to $14,715.07 in 1944. It is conceded that neither Realty nor its successor, Western Development, erected a building for the parent company, although the latter in 1949 acquired the site for a new plant and a building was erected thereon at a total cost of nearly $400,000.

As shown, the ultimate question for decision is whether petitioner is entitled to the benefit of Sec. 112(b) (3), which provides:

> "No gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are, in pursuance of the plan of reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization."

That a reorganization was effected is conceded by the Tax Court. There is, however, a serious question as to what was embodied therein. Sec. 112(g) designates the forms of reorganization which are permissible. As is stated in Treasury Regulation 111, promulgated under the Internal Revenue Code (Sec. 29.112 (g)–1):

> "Section 112(g) limits the definition of the term 'reorganization' to six kinds of transactions and excludes all others. From its context, the term 'a party to a reorganization' can only mean a party to a transaction specifically defined as a reorganization by section 112(g)."

Of these six forms of reorganization, two are material to the instant situation, namely, (D) and (E). The former provides, "a transfer by a corporation of all or a part of its assets to another corporation if immediately after the transfer the transferor or its shareholders or both are in control of the corporation to which the assets are transferred," and the latter, "a recapitalization." What is meant by the term "recapitalization" has not been defined either by Congress or the Treasury Regulations. As was said in Bazley v. Commissioner, 331 U.S. 737, 740, 67 S.Ct. 1489, 1490, 91 L.Ed. 1782:

> "While § 112(g) informs us that 're-organization' means, among other

things, 'a recapitalization,' it does not inform us what 'recapitalization' means. * * * Congress has never defined it and the Treasury Regulations shed only limited light."

The court also, 331 U.S. at page 741, 67 S.Ct. at page 1491 referred to a recapitalization as "an aspect of reorganization". We think it could be more appropriately referred to as a hybrid reorganization. On the other hand, we are left in no doubt as to what constitutes a reorganization as defined by (D). It is there spelled out in certain and unambiguous language.

■ The Tax Court has found (1) that the sole purpose of the reorganization was to escape taxes and as a result served no business purpose, and (2) that the exchange of stock between petitioner and the parent company was for all practical purposes equivalent to the distribution of a dividend. We assume that ordinarily we would be bound by such findings. We are not bound, however, if that court in appraising the situation used an improper yardstick. We think that it did, and in doing so erred as a matter of law.

The Tax Court initiates its opinion by the concession, "We agree that the exchange between the parent and its shareholders met the literal requirements of section 112(b) (3) of the Internal Revenue Code." This concession is predicated upon the premise that the reorganization encompasses nothing more than the parent's recapitalization, which resulted in the transfer of the Realty stock to petitioner. The Tax Court in its opinion states:

> "Petitioner would have us approach the 'reorganization' in issue as a transaction which started with the ranch in the hands of the parent as a dividend received from the subsidiary. However, to ignore the plain fact that the 'reorganization' represented only the latter phase of a larger over-all plan, which plan had been thoroughly discussed and finally decided upon long prior to the purported 'reorganization' and was actually launched by the severance of the ranch from the subsidiary, would be completely unrealistic

and serve only to distort the genuine substance of the whole transaction."

The substance of petitioner's contention here is that the "over-all plan" referred to by the Tax Court was embodied in the reorganization, and with this we agree. To treat the situation otherwise would, in the language of the Tax Court, "distort the genuine substance of the whole transaction." The Tax Court for the purpose of determining the scope of the reorganization ignores not only the events and transactions which preceded the recapitalization of the parent but also those which followed. By this unrealistic limitation upon what was embodied in the reorganization, the Tax Court concludes that the rationale of Bazley v. Commissioner, supra, is controlling. In that case, reorganization was by recapitalization, Sec. 112(g)–(1) (D) was not involved. We need not be too much concerned, however, with the Bazley case because even the narrow premise upon which the Tax Court stands in the instant case leaves a wide gulf between the facts there and those here. There, the taxpayer as a result of the recapitalization had exchanged old stock for new and debentures which the court held to be the equivalent of cash. The court reasoned that such exchange was "merely a vehicle" for conveying earnings from accumulations to the stockholders. Here, the taxpayer received stock in another corporation, which we do not think can be denominated as the equivalent of cash, and the stock which he received was held for four years (until 1946), when it was exchanged for stock in Western Development Company, upon the latter's acquirement of the assets of Realty. Even though the court in the Bazley case found that the recapitalization failed to constitute a bona fide reorganization, it recognized, 331 U.S. at page 740, 67 S.Ct. at page 1491:

"But there are circumstances where a formal distribution, directly or through exchange of securities, represents merely a new form of the previous participation in an enterprise, involving no change of substance in the rights and relations of the interested parties one to another or to the corpo-

rate assets. As to these, Congress has said that they are not to be deemed significant occasions for determining taxable gain."

Prior to a statement of what we conclude was embodied in the reorganization in the present case, we think it appropriate to make some comment upon the reasoning of the Tax Court by which it reaches the conclusion that the "net effect" of the plan of reorganization was for all practical purposes equivalent to the distribution of a dividend. This reasoning and result is reached upon an extended discussion of the prior tax controversies between the Commissioner and the subsidiary company. In such discussion, the Tax Court states:

"The subsidiary's difficulties with the Commissioner arose to a large degree from the devotion of the ranch and its highly personalized improvements to the use and enjoyment of the petitioner."

We wonder if the Tax Court overlooked the fact that those difficulties were settled by compromise quite favorably to the taxpayer and the fact (heretofore shown) that the Tax Court itself in a previous decision had decided such issues even more favorably to the taxpayer, 10 T.C. 279.

It also appears that the Tax Court places much stress upon what it discerns as a studied effort on the part of the petitioner and his advisers to devise a plan by which tax could be avoided. We have no doubt but that the avoidance of tax occupied a high position upon the agenda of matters considered by petitioner and his advisers but, even so, they were within their legal rights, providing they did not, in accomplishing such purpose, run afoul of some statutory inhibition. As Judge Learned Hand said, in Helvering v. Gregory, 2 Cir., 69 F.2d 809, 810:

"We agree with the Board and the taxpayer that a transaction, otherwise within an exception of the tax law, does not lose its immunity, because it is actuated by a desire to avoid, or if one choose, to evade, taxation. Any one may so arrange his affairs that his taxes shall be as low as possible; he is

not bound to choose that pattern which will best pay the Treasury; there is not even a patriotic duty to increase one's taxes."

And the Supreme Court in the same case, Gregory v. Helvering, 293 U.S. 465, 469, 55 S.Ct. 266, 267, 79 L.Ed. 596, stated:

"The legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits, cannot be doubted."

Again, in Chisholm v. Commissioner, 2 Cir., 79 F.2d 14, at page 15, 101 A.L.R. 200, Judge Hand, in commenting upon the Supreme Court decision in the Gregory case, after pointing out that the reorganization in that case was a sham, stated:

"That was the purpose which defeated their exemption, not the accompanying purpose to escape taxation; that purpose was legally neutral. Had they really meant to conduct a business by means of the two reorganized companies, they would have escaped whatever other aim they might have had, whether to avoid taxes, or to regenerate the world."

Thus, we think it is too late to reason that there is wrong in an attempt, even if successful, to reduce or avoid taxes. It is not a factor which precludes a taxpayer from obtaining the immunity granted by the statutory provisions in question; it is an incident which attaches upon a bona fide compliance therewith.

The Tax Court in its opinion also states:

"Although the parties saw fit to cast the transaction in the literal form of a reorganization under sections 112(b) (3) and 112(g) (1) (D), it was not, in our judgment, 'the kind of transaction with which section 112(g) "in its purposes and particulars, concerns itself" '."

We agree that there was a reorganization under Sec. 112(g) (1) (D); in fact, we think that is the controlling section. Certainly there was a transfer by the parent company of a part of its assets to Realty and, immediately thereafter, the parent company and its shareholders were in con-

trol of Realty. It is not discernible to us, however, how the Tax Court can with logic or reason predicate its decision upon the premise that there was a reorganization merely by a recapitalization of the parent company and at the same time concede that there was a reorganization under (D). Such reasoning leads to the result that there were two separate and distinct reorganizations, the first which was complete when the Realty stock was received by the parent company, and the second which commenced at that point.

We need not repeat the facts heretofore set forth. It is our judgment that the reorganization embodied a transfer of the ranch property by the subsidiary to the parent company, the organization of another corporation (Realty), a transfer of the ranch property to Realty, the issuance of stock by Realty in payment therefor and delivery of the same to the parent company to be distributed to the latter's stockholders in connection with the recapitalization of the parent company. Each of these steps was proposed by the directors of the parent company and approved by its stockholders. Thus, while the recapitalization of the parent company might have constituted a reorganization if standing alone, it did not do so under the circumstances presented. It was nothing more than one segment of a reorganization which included numerous transactions, including the organization of another corporation (Realty).

From the limited form of reorganization which the Tax Court embraces, it finds that no business purpose was served. This finding of no business purpose, however, is immediately dissipated when the reorganization is considered in its true make-up. When thus considered, we doubt if the Tax Court would disagree because it stated in its opinion that "the ranch served no useful function in the business of the parent company." The Commissioner in his brief states, "We may agree with the taxpayer that there were good business reasons for separating the ranch property from the pharmaceutical business of the operating subsidiary." Undoubtedly, the ranch property was a "white elephant" in the hands of either the subsidiary or the

parent company. Whatever might have been the motivating factor in its acquirement by the subsidiary, it was, after the hormone project had been abandoned, no longer germane to the business of either the subsidiary or the parent. Each year its operating expenses far exceeded its income, and that it was sound judgment to rid these pharmaceutical companies of such a liability is hardly open to question.

With this problem on hand, petitioner consulted legal counsel and an accountant relative to its solution, the final result of which was the reorganization in question, and it is not helpful to suggest that the objective might have been attained in some other manner, such as a distribution of the ranch property by the parent company to its stockholders as tenants in common, or a sale of the ranch property and payment of the proceeds to its stockholders as dividends. The former, of course, would have been highly impractical and the latter might have been inexpedient because of the depressed market for ranch property at that time, or for other reasons. In any event, with more than one avenue open to the taxpayer, he was not bound, as Judge Hand stated (heretofore quoted), "to choose that pattern which will best pay the Treasury."

The Commissioner cites a number of cases in support of the contention that a reorganization within the provisions of Sec. 112 must fulfill the general purpose for which they were enacted. Among such cases are Bazley v. Commissioner, 331 U.S. 737, 67 S.Ct. 1489, 91 L.Ed. 1782, and Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596. We have heretofore referred to these cases and nothing more need be said as to the former, but some further comment seems appropriate as to the latter. There, the taxpayer owned all the stock in one corporation (A) which held among its assets 1,000 shares of another corporation (B). The taxpayer sought to bring about a reorganization under Sec. 112(g) of the Revenue Act of 1928, and caused a third corporation (C), to be organized. Three days later corporation A transferred to corporation C all the stock owned by it in corporation B.

Six days later corporation C was dissolved and liquidated by distributing all its assets, namely, the stock in corporation B, to the taxpayer. No other business was transacted or intended to be transacted by corporation C. The taxpayer immediately sold the stock in corporation B for $133,333.33. Concerning this transaction the court stated, 293 U.S. at page 469, 55 S.Ct. at page 267:

"When subdivision (B) speaks of a transfer of assets by one corporation to another, it means a transfer made 'in pursuance of a plan of reorganization' (section 112(g)) of corporate business; and not a transfer of assets by one corporation to another in pursance of a plan having no relation to the business of either, as plainly is the case here."

And further, speaking with reference to corporation C, the court stated, 293 U.S. at page 469, 55 S.Ct. at page 267:

"But that corporation was nothing more than a contrivance to the end last described. It was brought into existence for no other purpose; it performed, as it was intended from the beginning it should perform, no other function. When that limited function had been exercised, it immediately was put to death."

Evidently, the organization of the third corporation was a sham or, as stated in Bass v. Commissioner, 1 Cir., 129 F.2d 300, 309, "the ephemeral new corporation was simply an operation having no business or corporate purpose". While the Gregory case was decided against the taxpayer, it is illuminating when its facts are contrasted with those here. That Realty was organized for a bona fide legitimate purpose is hardly open to question and, as already shown, the Tax Court found that for four years it owned and operated the property as a cattle ranch.

The Commissioner argues, "Since the distribution of the Realty stock had nothing to do with a recapitalization of the parent, it is plain that the taxpayer did not receive that stock in exchange for his former stockholding in the parent." There are several fallacies in this argument. In the first

place, it is inconsistent with the finding of the Tax Court that the "exchange between the parent and its shareholders met the literal requirements" of Secs. 112(b) (3) and 112(g) (1) (D). We do not think there could be a literal compliance with these sections in the absence of receipt by the taxpayer of his stock in the new corporation as well as that in Realty in exchange for his old stock. Secondly, this argument rests upon the theory embraced by the Tax Court that the reorganization was confined solely to the parent's recapitalization which, as heretofore pointed out, is in our judgment erroneous. Furthermore, the business purpose of separating the ranch property from the pharmaceutical business was not fully consummated upon the receipt by the parent of the stock in Realty. At that point, by its stock ownership, it still indirectly was the owner and responsible for the ranch property. The business purpose sought to be accomplished was complete only when the parent had divested itself of stock in Realty. As already shown, it was pursuant to the reorganization that the stock in Realty was transferred to petitioner.

The Commissioner states, "The focal point of the inquiry lies in what the taxpayer received." Assuming that such is the case, we know that he did not receive cash, debentures, negotiable instruments or any other form of instruments which would create the relation of debtor and creditor between him and the parent company. The receipt of the Realty stock produced neither gain nor loss to him. Prior thereto, he had a proprietary interest in the parent company; subsequently, he had a proprietary interest in both the parent company and in Realty, the sum of the two interests being exactly the same as he formerly held in the parent company. And that this proprietary interest was continued is evidenced by the fact that he retained his stock ownership in both corporations for many years.

■ As is stated in Treasury Regulation 111, Sec. 21.112(g)–1:

"The purpose of the reorganization provisions of the Internal Revenue Code is to except from the general rule certain specifically described exchanges incident to such readjustment of corporate structures, made in one of the particular ways specified in the Code as are required by business exigencies and which affect only a readjustment of continuing interests in property under modified corporate forms. Requisite to a reorganization under the Code are a continuity of the business enterprise under the modified corporate form, and a continuity of interest therein on the part of those persons who were the owners of the enterprise prior to the reorganization."

See also 3 Mertens Law of Federal Income Taxation, page 183; Lewis v. Commissioner, 1 Cir., 176 F.2d 646.

In the view which we take, we need not dissect Commissioner's argument relative to the recapitalization by the parent company. Being merely a segment of the reorganization which actually took place, it is sufficient, in our judgment, that the recapitalization met the literal requirements of the statute. While we disagree with the Commissioner's contention that receipt of the Realty stock by petitioner was equivalent to the payment of a dividend under Sec. 115, we see no reason to labor the point in view of our conclusion that the reorganization was within the terms of Sec. 112(b) (3) and that petitioner was entitled to the benefit thereof. At any rate, it is not discernible after so holding why there is any occasion to discuss the relevancy of Sec. 115. It is true, no doubt, as argued by the Commissioner, that the accumulated earnings of the parent company were reduced by the exchange in controversy. It does not follow, however, that such exchange is equivalent to the payment of a dividend. We suppose that many reorganizations would produce a like effect. The reorganization being within the contemplation of Sec. 112(b) (3), the taxpayer is entitled to the immunity which flows therefrom, irrespective of the effect which may be had upon the accumulated earnings of the parent company.

The decision of the Tax Court is reversed and the deficiency expunged.