MADGE CHRISTIE et al., Individually and as Class A Stockholders on Behalf of Themselves and All Other Class A Stockholders of FIFTH MADISON CORPORATION Similarly Situated, Respondents, and FRANCES ZAUDERER, Intervenor-Respondent, v. FIFTH MADISON CORPORATION et al., Appellants, and MANUFACTURERS TRUST COMPANY, Respondent.

First Department, March 14, 1961.

*Harry Bijur* of counsel (*Bijur & Herts,* attorneys), for Frances M. Purdy and another, appellants.

*Eugene Blanc, Jr.,* of counsel (*Dorothy S. McCrea* with him on the brief; *Delafield, Hope, Rich, Linker & Blanc,* attorneys), for Fifth Madison Corporation and others, appellants.

*Bernard Buchwald* of counsel (*Bernard Nadel, Edmund B. Hennefeld* with him on the brief; *Hoffman, Buchwald, Nadel, Cohen & Hoffman,* attorneys), for Madge Christie and another, respondents.

*Stephen S. Bernstein* of counsel (*James H. Powell* with him on the brief; *McLaughlin & Stern,* attorneys), for intervenor-respondent.

RABIN, J. The appellants appeal from a judgment which declares '' that 18,456 shares of Class A capital stock of the defendant, Fifth Madison Corporation, now on deposit with the defendant, Manufacturers Trust Company, are the sole and exclusive property of the defendant, Fifth Madison Corporation '' and directs that such stock be turned over to the Fifth Madison Corporation. The judgment decrees that the Fifth Madison Corporation, its officers and directors and all of the defendants, except the Manufacturers Trust Company, '' be * * * directed to take all necessary steps and do all acts to retire all of the 18,456 shares of Class A stock ''.

The Fifth Madison Corporation is the owner of property known as the Canadian Pacific Building. It is located at 342 Madison Avenue. A brief history of the building, its ownership and of its financing will serve to give a better understanding of the issues involved and perhaps throw some light on their resolution.

The Canadian Pacific Building is a 21-story church and office building built in 1921. A substantial portion of the financing was obtained through the sale of an issue of $1,000 second mortgage bonds to the members of the church (Fifth Church of

Christ Scientist). During the depression the building encountered financial difficulties. As a consequence, a plan of reorganization was submitted, approved, and became effective in 1938. This plan provided for the formation of the appellant Fifth Madison Corporation and for the purchase of the property by that corporation.

Pursuant to the plan two classes of stock were issued by the newly formed corporation. There were 30,000 shares of Class A and 25,000 shares of Class B stock. All voting rights were vested in the Class B stock which alone had the right to dividends to the exclusion of Class A stock. The interest of Class A stock was limited to a 25% share of the residual equity in the event of a sale of the building or a liquidation of the corporation after a priority distribution of $20 per share to the Class B stock. Class B stock was entitled to the remaining 75% of the residual equity. The 25,000 shares of Class B voting stock were issued to the Fifth Church of Christ Scientist. The Class A stock was reserved for the holders of the bonds.

The plan provided for the surrender of the original $1,000 second mortgage bonds. In return for each such bond the holder was to receive a 15-year 6% cumulative interest bond in the face amount of $1,000, a scrip certificate in the amount of $246.05 (representing the interest arrears on the original bond) and 20 shares of Class A stock.

Subsequent to the adoption of the plan of reorganization, the corporation retained the services of the defendant, Purdy Management Corporation, to manage the building. The management arrangement continued until 1945. In April of that year the church sold the 20,000 shares of Class B stock it then owned to the management corporation for $300,000 payable $25,000 down and the balance in installments. In connection with that sale the management corporation obligated itself to purchase over a stipulated period the second mortgage bonds, the scrip and the Class A stock. However, the management corporation failed to carry out that obligation.

Anticipating the difficulties which would arise when the bonds matured in 1953, a statutory extension was sought pursuant to section 122-a of the Real Property Law. However, the court disapproved the plan and it was subsequently withdrawn.

In March of 1953 a voluntary plan of reorganization was advanced by the Purdys. It was in consequence of the consummation of that plan that this controversy arose.

The plan provided for the surrender of the $1,000 bonds (including the unpaid interest accrued thereon), the $246.05 in scrip, and the 20 shares of Class A stock which were in the

hands of the holders by reason of the original reorganization plan. In exchange for each of such units the holder was to receive a new seven-year 6% bond in the face amount of $1,346 (representing the $1,000 bond, the $246.05 in scrip and $5 for each share of Class A stock) and an interest warrant in the amount of $492.50 (the amount of unpaid interest on the former bond surrendered).

The plan provided for the retirement of the bonds in the hands of such bondholders as refused to participate, by the payment of the principal and the interest due upon such bonds. Upon such payment there would then remain in the hands of such nonparticipating bondholders the scrip and the Class A stock (representing liquidation rights) which had been given to them upon the first reorganization.

A letter soliciting the participation of all of the holders of the second mortgage bonds was sent to them on March 3, 1953. The substance of the plan was outlined in that letter. It is important to note that the bondholders were advised by that letter that the surrendered " Class A stock will not be cancelled but will be delivered to or in accordance with the written instructions of Fifth Madison Corporation." In response to the letter assents were received from bondholders holding slightly over $900,000 out of a total of $1,462,100 of outstanding bonds (the plan provided for a maximum participation of $977,000).

However, the Securities and Exchange Commission, whose approval of the underlying trust indenture was sought under the Trust Indenture Act of 1939 (U. S. Code, tit. 15, § 77aaa *et seq.*), raised certain objections. The principal objection was directed to the fact that the bondholders had been solicited prior to the qualification of the trust indenture under the act. The commission required that a second letter containing more detailed information be sent to the assenting bondholders giving them the right to rescind their prior approval. Among other items it was required that the letter include a " *pro forma* capitalization table " showing the capitalization of the corporation based upon the assumption that the plan would be consummated. A proposed form of such letter was prepared and submitted to the commission as part of the application for approval of the trust indenture which was subsequently approved. That letter, which was dated April 24, 1953, was sent to all assenting bondholders. It offered the bondholders the right to rescind and stated that the decision of the bondholders " should be made solely upon the information contained in this letter and in the accompanying papers, not upon matter previously sent ". While it did not contain the statement that

the surrendered Class A stock would not be cancelled it did state that "[t]he plan itself is not changed." Furthermore, annexed to the letter was an analysis of the approved trust indenture. The analysis was prefixed by the following statement: "The following statements and descriptions are summaries of certain provisions of the proposed Second Supplemental Indenture. Such statements and descriptions do not purport to be complete and are in all respects subject to and qualified individually and in their entirety by the provisions of said Second Supplemental Indenture to which reference is made." The trust indenture referred to provided that the bonds and scrip surrendered pursuant to the plan "shall be canceled by the Trustee." In distinction, however, it provided that "[t]he Class A stock of the Company so delivered to the Trustee shall be delivered by it to the Company or to such person or persons as the Company may in writing direct."

None of the original assenting bondholders elected to rescind. The bonds, the scrip and the Class A stock which were required to be surrendered to the trustee by the assenting bondholders were deposited with the trustee with a transmittal letter signed by the surrendering bondholders authorizing the trustee to retire and cancel the bonds and scrip " and to deliver the Class A stock to or in accordance with the written instructions of Fifth Madison Corporation." From the time of such deposit until the present no such instructions have been given as to the disposition of the stock and it continues in the hands of the depository bank.

In April, 1953 the plaintiff, Christie, the owner of a share of Class A stock, commenced a stockholders' action to set aside the reorganization plan. The complaint in that action was finally dismissed and we are not here concerned therewith.

In 1956 the instant action was commenced. In the first cause of action it is alleged that the reacquired Class A stock (19,540 shares) had wrongfully been transferred to the Purdy interests to the detriment of the corporation. The plaintiffs asked that the court declare such shares to be the property of the corporation and sought a direction that they be retransferred to the corporation. The second cause sought a direction that the reacquired Class A stock be cancelled.

A trial was had. The trial court held the reacquired Class A stock to be the property of the corporation (there was no proof of any transfer to the Purdys) and directed that the defendant Manufacturers Trust Company surrender the stock to the corporation and that the corporation and the other defendants

take all necessary steps to "retire" such stock. It is evident from the remaining decretal portions of the judgment that the import of the word "retire" was that the stock be cancelled. These findings were reflected in the judgment and it is from this judgment that the defendants appeal.

We have no difficulty in coming to the conclusion that with respect to the reacquired shares (if they may be considered property), they "belong" solely to the corporation.

The principal question to be decided is whether the plan of reorganization provides for the cancellation of the reacquired stock. A finding that the plan calls for such cancellation would, of course, be to the advantage of the plaintiffs and the other nonassenting bondholders. It would mean that the reacquired shares could not then be reissued. The nonassenting bondholders would be assured that the 25% of the residual equity representing the interests of the Class A stockholders would be distributed to them alone. Under a contrary finding the corporation could conceivably reissue those reacquired shares with a resultant dilution of the interest of the nonassenting stockholders in such residual equity.

The plaintiffs, of course, contend that the plan contemplated the cancellation of the reacquired stock, while it is the defendants' position that the plan did not require such cancellation but merely provided that it be held subject to the instructions of the corporation.

The original letter proposing the plan of reorganization was sent to all of the bondholders. In clear and in explicit language it informed them that the Class A stock which was to be surrendered pursuant to the plan, was not to be cancelled, but was to be held subject to corporate direction. In choosing not to participate the nonparticipating bondholders did so with the full knowledge that the stock was not to be cancelled. If it be held that the stock is not to be cancelled they would be getting all that they expected; no vested rights would be impaired by the plan and they would have no just cause for complaint. However, that is not to say that they are not entitled to receive all of the benefits accruing to them under the plan as finally formalized even though those benefits be more than they originally bargained for. Thus, if the plan provided for cancellation of the stock their interest would be enlarged. But did the plan so provide?

The statement of noncancellation contained in the original letter, unless rescinded or changed by a subsequent letter or document, constitutes strong evidence of the purport of the plan with respect to those reacquired shares. I can find nothing

of substance in any of the subsequent documents that either expressly or by implication rescinds or modifies that original declared intention.

True, the second letter sent to the assenting bondholders at the direction of the Securities and Exchange Commission advised those bondholders that their decision was to be made solely upon the information therein contained and it is likewise true that the letter did not in so many words reiterate the non-cancellation reference contained in the original communication. However, the weight that the plaintiffs seek to ascribe to these facts is more than that to which they are entitled.

To begin with there was an explicit statement that "[t]he plan itself is not changed." Furthermore there was nothing in that subsequent letter that would indicate a change in the noncancellation provision of the plan as previously announced. Quite the contrary—the documents sent with the second letter affirmatively and unequivocally support the position that the stock was not to be cancelled. Annexed to the letter was an analysis of the trust indenture which specifically incorporates the indenture by reference and expressly makes the analysis "subject to and qualified" by that indenture. As heretofore pointed out, the trust indenture provides for the cancellation of the bonds and scrip delivered but in contrast clearly states that the Class A stock shall be delivered by the trustee "as the Company may in writing direct." That contrast points up the clear intention not to cancel—for had it been the purpose of the plan to do so the stock would have been treated exactly in the same manner as the scrip and the bonds. Moreover, the transmittal letter accompanying the surrender of the Class A stock demonstrates the understanding of all who participated, that the stock was not to be cancelled. That letter stated that the transmitted stock was to be treated "in accordance with the written instructions of the Fifth Madison Corporation."

We must not lose sight of the purpose of the letter of April 24, 1953 which was sent at the direction of the Securities and Exchange Commission. It was sent so that the provisions of the plan be clarified and, in the light of such clarification, to give the assenting bondholders an opportunity to rescind their previous assents. The proposed letter with the documents annexed was submitted to the Securities and Exchange Commission before issuance and before the trust indenture was approved by the commission. Having that proposed letter before it the Securities and Exchange Commission did approve of the trust indenture which, as indicated, made provision for the handling of the surrendered stock in the manner other than

by cancellation. It would seem that if the submitted communication with the document annexed was in conflict with the provision of the trust indenture which provides for the retention of such stock the Securities and Exchange Commission would not have approved it. It should be noted that the indenture defined the " Amended Plan " as being the one " set forth in a letter dated March 3, 1953 " (Indenture Art. I, Sec. 1[i]).

All of the foregoing points to the conclusion that the plan did not propose the cancellation of the surrendered stock. However, consideration has not as yet been given to the cornerstone of the plaintiffs' argument which rests upon the *pro forma* capitalization table as appears in the letter of April 24, 1953, sent to the assenting bondholders at the direction of the Securities and Exchange Commission. That table is based upon the assumption that the plan would be accepted by the maximum number of bondholders allowed under the plan, i.e., $977,000 in principal amount, leaving in the hands of nonparticipating bondholders 9,702 shares of the Class A stock. That is reflected in the following appearing in the *pro forma* capitalization table: " Class A stock, Par Value $1 — $9,702." It is this item of the table upon which the plaintiffs rest almost solely in support of their position and it is this listing that was so heavily relied upon by the trial court in finding that the plan contemplated cancellation. The gist of the argument of the plaintiffs with respect to that listing as appears from their brief is as follows: " Since prior to consummation of the Plan the capitalization table ' at April 1, 1953 ' showed 29,242 shares of Class A stock issued and outstanding  *  *  *  and *after* consummation of the Plan, assuming maximum acceptance by bondholders owning $977,000 of bonds, there would remain capable of being re-issued [*sic*] only 9,702 of such shares, *this meant necessarily cancellation and retirement of the difference between 29,242 Class A shares and 9,702 shares, or exactly 19,540 shares.*"

But is such listing inconsistent with noncancellation and does it overcome all of the other considerations pointing to a purpose not to cancel the stock? To put the problem differently — are the plaintiffs correct in their conclusion that this listing " meant necessarily cancellation and retirement " of the stock? The Securities and Exchange Commission in approving the trust indenture after having before it the capitalization table seemed to have come to a different conclusion. And the authorities likewise indicate a different conclusion.

It is the prevailing rule that a corporation, upon reacquiring shares of stock, may at its option " carry them as ' treasury stock,' that is, treat them as being still issued and subject to

resale. * * * So-called ' treasury stock ' may be defined as shares which have been issued as fully paid and have thereafter been acquired by the corporation by purchase or donation, but not retired or cancelled or restored to the status of unissued shares. * * * *They are no longer outstanding shares* in the hands of a holder. They are not outstanding because the obligor has become the owner of the obligation.'' (Emphasis supplied.) (Ballantine, Corporations [Rev. ed.], pp. 614–615.) Being no longer '' outstanding shares '' there is no need, and perhaps it would have been improper, to list them as such on the *pro forma* capitalization statement. In *Winkelman* v. *General Motors Corp.* (44 F. Supp. 960, 994–995) the court, in referring to stock of a corporation which it reacquired and treated as treasury stock said: '' The Treasury stock was not ' issued and outstanding ' while retained by General Motors Corporation in its treasury. The shares of stock ' did not get that quality until some one received and held them as enforceable obligations ' ''. In coming to that conclusion the court referred to the opinion of Judge LEARNED HAND in the case of *Borg* v. *International Silver Co.* (11 F. 2d 147), observing that in that case the court '' had before it the question of the status of Treasury stock— whether it was issued and outstanding.'' Judge HAND in refer- ring to reacquired stock there said (p. 150) that such '' shares should not have appeared in the [balance] sheets at all, or, if they did, only as held for retirement.'' He said further that '' they were not ' outstanding,' because they were held by the defendant; to be ' outstanding,' they must be effective obligations against it.''

It is therefore apparent that carrying the item of 9,702 shares of Class A stock in the *pro forma* capitalization table is in nowise an indication that it '' necessarily '' meant cancellation of the reacquired stock—particularly so in the light of the strong evidence of a purpose not to cancel them.

How will a finding that the surrendered stock is not to be cancelled affect the interests of the present holders of Class A stock? Treasury stock, as such, is not considered as an asset of the corporation. It is only what is received in consideration of its reissuance that is considered an asset of the corporation. The Treasury stock in and of itself while held by the corpora- tion has no value, and so '' Treasury shares carry no voting rights or rights as to dividends *or distributions*. Their existence as issued shares is a pure fiction, a figure of speech to explain certain special rules and privileges as to their reissue.'' (Emphasis supplied.) (Ballantine, Corporations, *supra*, p. 615.)

It follows, therefore, that should this corporation be liquidated today, 25% of the residual equity would then be distributed solely to those presently holding Class A stock, even to the exclusion of the corporation. Of course, if the reacquired Class A stock should be reissued, the new holders would be entitled to join the present holders and receive a proportionate distributive share upon liquidation. However, '' ownership '' of such reacquired Class A stock being in the corporation it may not reissue such shares except for a proper corporate purpose and for an adequate consideration. To do otherwise would make those responsible for their reissuance answerable to all of the stockholders, including holders of the Class A stock then outstanding, whose interest would certainly be affected by any such action.

The conclusion that must therefore be reached is that despite the listing of only 9,702 shares of Class A stock as being outstanding (in contemplation of the proposed plan becoming effective) the evidence strongly preponderates in favor of the defendants' contention that the plan contemplated no cancellation of the reacquired Class A stock but that it was to be held subject to the further direction of the corporation.

Accordingly, the judgment should be modified on the law and the facts, without costs, by deleting therefrom the second, fourth, fifth, sixth and seventh decretal paragraphs; by amending the first decretal paragraph so as to delete therefrom the words '' and that Manufacturers Trust Company surrender and deliver said shares to Fifth Madison Corporation ''; by amending the third decretal paragraph by adding the following: '' Subject, however, to the right of the corporation to reissue the 18,456 shares of the reacquired Class A stock in its discretion for a proper corporate purpose and for an adequate consideration ''; by amending the eighth decretal paragraph by deleting therefrom the words '' the plaintiffs, or any of them '' and substituting therefor the words '' any of the parties '' and by adding a new seventh decretal paragraph providing for costs against the plaintiffs in favor of the defendants.

Settle order.

Botein, P. J., Breitel, Valente and McNally, JJ., concur.

Judgment unanimously modified, on the law and on the facts, without costs, by deleting therefrom the second, fourth, fifth, sixth and seventh decretal paragraphs; by amending the first decretal paragraph so as to delete therefrom the words '' and that Manufacturers Trust Company surrender and deliver said shares to Fifth Madison Corporation ''; by amending the third decretal paragraph by adding the following: '' Subject, how-

ever, to the right of the corporation to reissue the 18,456 shares of the reacquired Class A stock in its discretion for a proper corporate purpose and for an adequate consideration "; by amending the eighth decretal paragraph by deleting therefrom the words " the plaintiffs, or any of them " and substituting therefor the words " any of the parties " and by adding a new seventh decretal paragraph providing for costs against the plaintiffs in favor of the defendants. Settle order on notice.