**NATIONAL CAN CORPORATION,**
**Plaintiff,**

v.

**UNITED STATES of America,**
**Defendant.**

**No. 76 C 4050.**

United States District Court,
N. D. Illinois, E. D.

July 10, 1981.

Larry D. Blust, Chicago, Ill., for plaintiff.

Kevin J. Egan, Asst. U. S. Atty., Chicago, Ill., for defendant.

## MEMORANDUM

LEIGHTON, District Judge.

### I

This is a suit by a corporate taxpayer to recover $2,026,277, plus interest, in income taxes assessed and paid for the years 1969, 1970 and 1971. The controversy between the parties involves the tax treatment of money received and payments made in connection with two aspects of an issue of debentures by a subsidiary of the corporate taxpayer and sale to foreign investors. A term of the debentures allowed a holder to convert his interest into common stock of the plaintiff corporation. All of the subsidiary's obligations under the debentures were guaranteed by the plaintiff taxpayer.

During the period 1969 through 1971, some of the debentures were exchanged for plaintiff's common stock at a time when the fair cash market value of the shares exceeded the price which had been agreed to for the exchange. Thus, this case presents issues concerning the proper tax treatment of the amount of money paid to plaintiff's subsidiary by foreign investors for the conversion feature of the debentures, and of the amount represented by the fair cash market value of plaintiff's common stock over the face value of the debentures at the time of the conversion. The parties have submitted the case on an agreed statement of the facts, oral arguments, and written briefs. This court has jurisdiction pursuant to 28 U.S.C. § 1346(a)(1).

## II

Plaintiff National Can Corporation was organized in the State of Delaware and has its principal place of business in Chicago, Illinois. It is on a calendar year for federal income tax purposes, keeps its records and files its tax returns for itself and subsidiaries on the accrual basis of accounting. It is an operating company engaged in business both directly and through the ownership of stock in subsidiary corporations. Its business is primarily the manufacture and sale of metal and glass containers, and related products.

On September 1, 1967, National created a subsidiary, the National Can Overseas Corporation, hereafter referred to as NCOC. This subsidiary, like National, is on a calendar year for tax purposes, keeps its records and files its federal income tax returns on the accrual basis of accounting. During the years 1969 through 1971, NCOC filed consolidated federal income tax returns as an affiliate of National. At the end of that period, December 31, 1971, there were 6,082,876 shares of National's common stock issued and outstanding. Each share had one vote on corporate matters, was not liable to call or assessment, and had no preemptive or subscription rights. National's stock was listed and actively traded on the New York and Midwest stock exchanges.

In early 1967, National's corporate development department recommended that if the corporation was to keep pace and be competitive in the container industry, it would have to expand into foreign markets; that creation of new foreign subsidiaries was not feasible because of existing competition, and costs of entering new markets; and that interests in existing overseas can manufacturers should be acquired instead. The department recommended that National's first foreign acquisition be Clover Industries, Ltd., a United Kingdom corporation primarily engaged in the business of manufacturing and selling metal containers in Great Britain. These recommendations were adopted. In order to maximize the amount of debt financing to comply with the balance of payments objectives declared by the President of the United States, National decided that overseas acquisitions would be financed by borrowing United States dollars in the hands of foreign holders, that is "Eurodollars".

In connection with its financial arrangements, National was advised by investment and legal counselors that because of United States tax laws and regulations, it could not borrow Eurodollars without subjecting foreign lenders to United States withholding tax on interests paid; and that the Eurodollars should instead be borrowed by a separate corporate subsidiary of National which would earn less than 20% of its income from United States sources. National was also advised that because of European tax and regulatory laws, the subsidiary it was going to organize should be a domestic rather than a foreign corporation. As a consequence, National incorporated NCOC with an authorized capital stock of 2,000 common shares without par value. On September 20, 1967, National's board of directors authorized the purchase of all NCOC stock for $1,400,000 in cash. At all times, NCOC has functioned as a separate corporate subsidiary of National.

In late 1967, NCOC formed an English subsidiary which acquired over 90% of the common stock of Clover. Interim financing for this acquisition was provided by short

term loans of Eurodollars to NCOC's English subsidiary by three American banks. These loans were to be repaid through the proceeds of a 20-year Eurodollar issue to be sold by NCOC to foreign investors in the form of proposed debentures. The interim loans were guaranteed by National. As to all of these contemplated financial ventures, National requested a ruling by the Internal Revenue Service as to the tax consequences of the proposed NCOC debentures. The ruling was given in a letter which referred to the tax consequences of the financial proposals. Then on December 6, 1967, NCOC's board of directors authorized the issuance of $7 million of NCOC debentures which were to be issued and sold in 1967, exclusively to foreign investors through underwriters. The debentures were sold to the underwriters at their face amount of $1,000 each, less a commission of 2½%. This totaled $175,000 paid to the underwriters, NCOC realizing $6,825,000 from the sale of the debentures. National guaranteed the payment of interest and principal of the debentures; NCOC agreed to issue them, and the subscribers agreed to subscribe to them. The debentures are referred to in the subscription agreement and labeled on their face "Bonds", in accordance with British usage, even though they were unsecured. They were listed and traded on the Luxembourg Stock Exchange. Their proceeds were applied by NCOC principally to repay the bank loans used to acquire Clover, to provide working capitol for Clover, and to acquire other foreign can manufacturing operations.

The NCOC debentures were bearer instruments with interest coupons attached, calling for payment of 5⅝% per annum, payable semiannually, on June 1 and December 1 of each year. They were in denominations of $1,000 and payable at par in 20 years on December 1, 1987, if not previously redeemed. They were redeemable by NCOC between five and twenty years from the date of issuance at a premium starting at 105¼% and ratably decreasing to 100%. All debentures redeemed had to be cancelled. They were convertible for the common stock of National any time after June 1, 1969, based on a price subject to adjustment to prevent dilution. The initial price at which they could be converted was $38.50 per share of National's common stock, a price approximately 110% of that at which the stock was being traded on the New York Stock Exchange on the date that NCOC debentures were issued. As a result of a two for one stock split, this price became $19.25 per share effective June 3, 1970.

The debentures were not subordinated; and those which have been converted into National common stock are not further convertible, could not be transferred except between National and the NCOC, are not redeemable unless all outstanding debentures are redeemed at the same time, and may be cancelled at the direction of the holder, being either National or NCOC. They contained on their face an agreement into which National entered with each holder guaranteeing unconditionally the due and punctual payment of principal and interest on the debentures if these were not paid by NCOC. National unconditionally guaranteed it would advance to NCOC such funds as would be necessary to enable payment of all principal and interest when due. The guarantee also provided that if NCOC failed to perform its obligation to convert the debentures into National common stock, National would "perform such obligation when and as such performance by [NCOC] is required, as if such obligation were being performed by" NCOC. In the guarantee, National agreed at all times after June 1, 1969, to have sufficient authorized but unissued or reacquired shares of its common stock available and properly registered to satisfy all unexercised conversion rights in full. In compliance with this guarantee, National reserved 181,818 shares of its authorized but unissued common stock for possible issuance in exchange for NCOC debentures and listed such shares on the New York and Midwest stock exchanges effective on official notice of issuance. National filed with the Securities and Exchange Commission, and caused to become effective on April 1, 1969, a registration

statement with respect to such shares. Pursuant to this guarantee, National kept such registration effective during all the years relevant to this controversy.

It has been determined by the Internal Revenue Service that the debentures would have had to have been priced to yield to maturity 6.9% if they had been sold in the Eurodollar market without being convertible for National's common stock. In order to yield this return, the debentures had to have been sold for 83.6% of face resulting in a discount of $1,148,720. The parties agree that the discount at which the debentures would have sold if they had not been exchangeable for National's common stock is $1,148,720. In other words, if the debentures had been issued without the privilege to convert them for National's common stock, but had contained all the other terms under which they were sold, they would have obtained a price of $5,851,280 rather than $7 million.

During the period 1969 through 1971, certain holders of the debentures exercised their right to exchange them for National common stock. On the dates most of such rights were exercised, the fair market value of National's common stock was in excess of the conversion price. During such years, NCOC did not own any National common stock; therefore, it was not able to meet its conversion obligation according to the terms of the debentures. On presentation of debentures by their holders, National, pursuant to its guarantee, exchanged its common stock and cash in lieu of fraction of shares. The excess of the fair market value of National's common stock issued at the time of the conversion (plus cash paid by National for fraction of shares) over the face amount acquired by National, for each year in issue in this case, was as follows:

| Year | Fair Market Value of National Common Stock Issued on Conversion for Debentures | Cash in Lieu of Fractional Shares | Total Value Given For Debentures | Face Amount of Debentures Acquired by National | Excess of Fair Market Value of Stock Over Face Amount of Debentures |
|------|------|------|------|------|------|
| 1969 | $7,398,117 | $11,504 | $7,399,621 | $4,232,000 | $3,167,621 |
| 1970 | 1,406,135 | 653 | 1,406,788 | 887,000 | 519,788 |
| 1971 | 349,821 | 314 | 350,135 | 244,000 | 106,135 |

The NCOC debentures received by National in the above conversion exchanges have been retained by it and have not been cancelled or called. NCOC has paid National interest on these debentures each year pursuant to their terms. Subsequent to December 31, 1971, five NCOC debentures were acquired by National for conversion to its common stock, pursuant to the guarantee. In addition, on June 8, 1977, National purchased NCOC debentures having a face amount of $58,000 on the open market for $48,285 in cash. As of December 31, 1978, National owned 5,426 NCOC debentures, 5,368 of which were acquired on conversion for its common stock pursuant to the guarantee and 58 of which were purchased for cash in the open market.

National filed timely consolidated federal income tax returns for the calendar years 1969 through 1971 for itself and its subsidiaries, including NCOC, and paid the taxes due. National treated the excess of the fair market value of its common stock (plus cash paid for fractional shares) issued for the debentures over their face amount received on the conversion as a premium paid for their acquisition and amortized such amount over their remaining life. The Internal Revenue Service disallowed deductions of $83,662, $181,489, and $200,242, respectively, for such amortization and assessed additional taxes against National as a result. Subsequently, National paid all the deficiencies assessed with respect to

these years. On March 10, 1976, National filed with the Internal Revenue Service a timely claim for refunds in the following amounts for the calendar years 1969 through 1971:

| Year | Refund Claimed |
| --- | --- |
| 1969 | $1,672,504 |
| 1970 | 255,735 |
| 1971 | 97,988 |

The grounds for the claimed refunds were as follows:

(a) That National was entitled to deduct from income in each year as either an ordinary and necessary business expense or as interest, the difference between the sum of the fair market value of its common stock and the cash in lieu of fractional shares exchanged for the debentures in each such year and the face amount of the debentures it received in exchange at the time of conversion.

(b) Alternatively, it was entitled to amortize this amount as a premium paid for acquisition of the debentures over their remaining life.

(c) Alternatively, the discount at which the NCOC debentures would have been sold if they had been issued without the right to exchange them for National common stock was amortizable over the life of the debentures as original issue discount.

On May 15, 1976, National filed with the Internal Revenue Service a waiver of Statutory Notification of Claim Disallowance in regard to the claims for refund. This waiver constituted rejection of National's claims by the Internal Revenue Service; and as a consequence, there is a controversy over which this court has jurisdiction.

## III

### A

■ The first issue which arises is whether National's subsidiary, NCOC, issued its convertible debentures in 1967 at a discount measured by the difference between their face value and the amount at which they would have been sold if issued without conversion rights, thereby entitling the subsidiary to amortizable discount deductions over the 20-year life of the bonds. It is agreed by the parties that when NCOC issued the $1,000 debentures at par in 1967, they would have had to be priced to yield 6.9% to maturity, if they had been sold in the Eurodollar market without being convertible to National's common stock; and to have yielded this return, the debentures had to have been sold for 83.6% of face value resulting in a discount of $1,148,728. Or, to state the point in another way, if the debentures had been issued without the conversion privilege, but had contained all the other terms under which they were sold, NCOC would have received $5,851,280 rather than the $7 million that in fact was paid by the foreign investors. Therefore, National contends that the convertible debentures were issued at a discount measured by the difference between their face value and the amount at which they would have sold if issued without the conversion right, thereby entitling NCOC to amortizable discount deductions over the 20 year life of the bonds.

In support of this contention, National points to the 1969 amendment to Section 1232(b)(2) of the Internal Revenue Code which provides, in pertinent part, that:

In the case of a bond or other evidence of indebtedness and an option or other security issued together as an investment unit, the issue price for such investment unit shall be determined in accordance with the rules stated in this paragraph. Such issue price attributable to each element of the investment unit shall be that portion thereof which the fair market value of such element bears to the total fair market value of all the elements in the investment unit. The issue price of the bond or other evidence of indebtedness included in such investment unit shall be the portion so allocated to it.

National insists that these statutory provisions disclose the intent of Congress that only the price paid for the indebtedness be included in the computation of "issue price" for the purpose of determining an original

issue discount. Thus, National claimed in its refund application, and argues in this court, that since the parties agree that had NCOC issued the debentures without the conversion privilege it would have received only $5,851,280 rather than $7 million, there was an original issue discount of $1,148,720 which NCOC had the right to deduct as amortizable bond discount over the life of the debentures.

The Internal Revenue Service rejected National's claim for a refund; and the defendant United States in this court argues that the same statute, Section 1232 of the Internal Revenue Code, Subsection (b)(1), defines the term "original issue discount" to mean the difference between the issue price and the stated redemption price at maturity.

"The term 'issue price' means the initial offering price to the public (excluding bond houses and brokers) at which price a substantial amount of such bonds or other evidences of indebtedness were sold. In the case of privately placed issues of bonds or other evidences of indebtedness, the issue price of each such bond or other evidence of indebtedness is the price paid by the first buyer of such bond.... For purposes of this paragraph, the terms 'initial offering price' and 'price paid by the first buyer' include the aggregate payments made by the purchaser under the purchase agreement, including modifications thereof."

It is insisted by the United States, supporting the position taken by the Internal Revenue Service, that application of the statutory definition produces a discount of zero on NCOC's issuance of its 7000 debentures with a face value of $1,000. The United States argues that NCOC issued its debentures at par; it in fact received $7 million, less brokerage commissions, as a result of the issuance. Therefore, the United States insists that since under the statutory definition of "issue price," the aggregate payments made by the foreign investors to NCOC were equal to the aggregate redemption price at maturity of the debentures, NCOC did not have any original issue discount which it had the right to deduct.

In support of this argument, the United States points to the Treasury Regulations on Income Tax, Section 1.1232–3(b) adopted by the Secretary in 1968. It cites three recent cases, contending that five separate courts have soundly and persuasively rejected National's claim of original issue discount for NCOC. They are *Chock Full O'Nuts Corp. v. United States*, 322 F.Supp. 772 (S.D.N.Y.1971), *aff'd* 453 F.2d 300 (2d Cir. 1971); *Hunt Foods and Industries, Inc. v. Commissioner*, 57 T.C. 633 (1972), *aff'd per curiam*, 496 F.2d 532 (9th Cir. 1974); *AMF, Inc. v. United States*, 476 F.2d 1351 (Ct.Cl.1973), *cert. denied*, 417 U.S. 930, 94 S.Ct. 2639, 41 L.Ed.2d 232 (1974).

National, however, responds that the Treasury Regulation adopted in 1968 is inconsistent with Section 1232(b)(2) of the Internal Revenue Code; and that the three cases cited by the United States are instances in which the courts either failed to appreciate the inconsistency in the Internal Revenue Service's approach to the original issue discount problem, failed to recognize the congressional decision to treat a conversion feature as a separate economic component of a bond or debenture, or mistakenly concluded that Congress has authorized the discrepant treatment of taxpayers which the facts of this case disclose. National argues that the three cases are poorly reasoned; they fail to analyze properly the points discussed in the briefs it has submitted to this court. Therefore, it suggests that "[s]ince the Seventh Circuit has not considered [the issue presented here], the Court is free to reach a more logical result in the present case and allow amortization of original issue discount."

The court does not agree with this suggestion. In its judgment, the three cases cited are not subject to the failings National ascribes to them in its arguments. They are not poorly reasoned; nor are they lacking in logic. In fact, since they differ from this case only insignificantly, the principles of law they represent are dispositive of the original issue discount claim which National asserts on behalf of its subsidiary.

In *Chock Full O'Nuts Corporation v. United States*, 453 F.2d 300 (2d Cir. 1971), a corporate taxpayer, in 1961, issued $100 par value convertible subordinated debentures due in 20 years. As did the parties here, the parties there stipulated that as of the date of issuance, the same debentures, without the conversion feature, would have sold for less than the $100 of face value. In its tax return for the year following issuance, the corporation did what National contends NCOC should be allowed to do in this case: it allocated a part of the amount received to the conversion privilege and treated the remainder as allocable to the debt value. As a result, the taxpayer claimed a deduction for original issue discount. The Commissioner denied the claim and assessed a deficiency with interest. The corporation paid the deficiency under protest and sued for a refund. In the district court, however, it was concluded that there was no original issue discount in the transaction. An appeal was taken to the Second Circuit. As it does in this case, the United States relied on Treas.Reg. § 1.1232–3(b), made retroactive to obligations issued after December 31, 1954, and which defined "issue price" in the case of an obligation convertible into stock, or into another obligation, to include "any amount paid in respect of the conversion privilege."

The corporation argued that convertible bonds or debentures are analogous to bond-warrant investment units which ordinarily consist of a bond obligation and an option or warrant for the purchase of stock; that the definition of "issue price" contained in 26 U.S.C. § 1232(b)(2), and in applicable treasury regulations, requires that in the case of investment units the total price received is to be allocated between the bond and the warrant according to their fair market values, with the market value of the bond being accepted as its issue price; and that consistency required the same treatment of a convertible debenture. It was insisted that to deny a corporation or borrower the right to deduct the value of the conversion privilege in determining whether it was entitled to an original issue discount was inconsistent with 26 U.S.C. § 171 and

regulations which require the subtraction of the value of any conversion privilege from the issue price of a debenture which is issued at a premium.

The Second Circuit affirmed in an opinion by Judge Mansfield, concluding that in the case of convertible debentures the definition of issue price contained in Treas.Reg. § 1.1232–3(b) was reasonable, and that although it had not been set forth in previous regulations, the definition represented the meaning of the term that had been prevalent in prior years. The corporation's argument that convertible bonds or debentures were analogous to bond-warrant investment units was rejected, the court saying that while this argument has a surface appeal, it ignores the essential economic differences between a bond-warrant investment unit and a convertible debenture.

The convertible debenture is an indivisible unit; the issuer has but one obligation to meet, either redemption *or* conversion. It can never be required to do both. With the bond-warrant investment unit, however, the holder receives and the issuer incurs two separate and independent obligations, and both may have to be fulfilled. Indeed, while the warrant and debt obligations are often issued as a package, since they are far more attractive to investors in unison than they would be separately, they are totally independent and separable obligations, and the warrant, unlike the conversion privilege should be independently valued. 453 F.2d 300, 305.

The court also disagreed with the corporation's argument that denial of the right to deduct the value of a conversion privilege in determining original issue discount was inconsistent with 26 U.S.C. § 171 and regulations promulgated thereunder.

It is true that the issuer of a bond at premium is not required to include in income that portion of the premium which represents the conversion privilege, nor is the holder entitled to deduct that amount as interest. But, as the district court properly noted, 322 F.Supp. at 776, in neither the premium nor the discount

cases is the amount attributable to the conversion feature allowed to be amortized. Thus, there is no substantive inconsistency in the treatment accorded by the Regulations to the value of the conversion feature. 453 F.2d 300, 305.

In *Hunt Foods and Industries, Inc. v. Commissioner*, 57 T.C. 633 (1972), the United States Tax Court had before it the case of a corporation which in 1961 issued $100 par value debentures that were convertible into shares of the corporation's common stock for each $100 face amount. The debentures were sold for a price that equaled or exceeded their stated redemption values. Then, for the 1962 and 1963 tax years, the corporation petitioned the Tax Court for relief, claiming it was entitled to an original issue discount because from the price received for the debentures, it had subtracted an amount equal to the value of the conversion privilege.

In asserting this claim, the corporation attacked both the validity and the applicability of Treas.Reg. § 1.1232–3(b); it argued that the Commissioner had taken an inconsistent position when he insisted on including the value of the conversion privilege in determining original issue discount while under the applicable statute and regulation such value is excluded for the purpose of determining the tax consequence of debentures issued at a premium. The court, however, held that the issue price of a convertible debenture included the value of conversion privileges in computing original issue discount; that for the purpose of computing deductible discount, the provisions of Treas.Reg. § 1.1232(b) were valid, and for this reason the corporation's claim of original issue discount was not allowable. This decision was affirmed *per curiam* by the Ninth Circuit. 496 F.2d 532 (9th Cir. 1974).

In *AMF, Inc. v. United States*, 476 F.2d 1351 (Ct.Cl.1973); the third of the cited cases, a corporation, in March 1961, issued at par convertible debentures each having a face amount of $100. They bore interest and were convertible into the corporation's common stock at one rate through March 1971, and at a lesser rate thereafter. In its petition for a refund in the Tax Court, the corporation alleged that on the date it issued the debentures the conversion right had a value of $3,591,999, while the debentures' pure debt value was $36,319,101. The corporation moved for summary judgment; the United States for judgment on the pleadings. From the contentions of the parties the issue presented was whether the value of the conversion right to which the debentures were subject could be deducted by the corporation so that for the tax years 1961, 1962 and 1963 it had an amortizable original discount. The court held that there was no original issue discount to be amortized.

In so ruling, the Tax Court pointed out that both the treasury regulation adopted after and the one in effect at the time of the transaction in question, were identical in providing that "[i]f bonds are issued by a corporation at a discount, the net amount of such discount is deductible . . . over the life of the bonds." According to the court, 26 U.S.C. § 1232(b)(1) provided that, for the purpose of determining a payee's gain, original issue discount was defined at the time of the transaction as "the difference between the issue price and the stated redemption price at maturity", and the issue price was defined in Section 1232(b)(2) as "the initial offering price to the public . . . at which price a substantial amount of such bonds or other evidence of indebtedness were sold." Nonetheless, the corporation argued that a convertible debenture is like a bond-warrant investment unit; and that the Internal Revenue Service's inclusion of value of a conversion privilege in determining an original issue discount was inconsistent with the regulation which required exclusion of such value in determining when a bond or debenture is sold at a premium.

However, the court stated:

It is more important that the parties to the transaction involving the bond issued with a conversion feature, issuer and holder, be treated consistently with one another. Since Section 1232(b)(2) precludes the possibility of the holder recognizing a discount in the case of bond

issued at par, consistency of treatment for all parties to the transaction directs that the issuer also be precluded from recognizing a discount for the same bond. The asserted inconsistencies between the sections dealing with different types of transactions are matters for Congress to consider. 476 F.2d 1351, 1353.

■ Thus it can be seen that in the three cited cases, in five separate rulings, each argument which National Can makes in this court was rejected after consideration of applicable tax law. These several rulings are consistent with "the established tax principle that a transaction is to be given its tax effect in accord with what actually occurred and not in accord with what might have occurred." *C. I. R. v. National Alfalfa Dehydrating & Milling Co.*, 417 U.S. 134, 148, 94 S.Ct. 2129, 2137, 40 L.Ed.2d 717 (1974); *Frank Lyon Co. v. United States*, 435 U.S. 561, 576, 98 S.Ct. 1291, 1300, 55 L.Ed.2d 550 (1978). National's arguments in this case, however, are inconsistent with this tax principle.

It is well established that discount is a form of interest, *i. e.*, a cost of obtaining capital. *AMF, Incorporated v. United States*, 476 F.2d 1351, 1352 (Ct.Cl.1973). Discount is a factor in arriving at the actual amount of interest paid for the use of capital procured by a bond issue. *Helvering v. Union Pac. R. Co.*, 293 U.S. 282, 286, 55 S.Ct. 165, 167, 79 L.Ed. 363 (1934). The controlling test in determining whether a corporation is entitled to deduction for original issue discount when debentures are issued is whether it has incurred some cost in acquiring the use of capital. *See Gulf, Mobile & Ohio R. Co. v. United States*, 579 F.2d 892, 896 (5th Cir. 1978); *cf. Cities Service Company v. United States*, 522 F.2d 1281 (2d Cir. 1974), *cert. denied*, 423 U.S. 827, 96 S.Ct. 43, 46 L.Ed.2d 43 (1975). And "the relevant inquiry in each case must be whether the issuer-taxpayer has incurred, as a result of the transaction, some cost or expense of acquiring the use of capital." *C. I. R. v. National Alfalfa Dehydrating & Milling Co.*, 417 U.S. 134, 147, 94 S.Ct. 2129, 2136, 40 L.Ed.2d 717 (1974); *and see, Fleish-er & Cary, The Taxation of Convertible Bonds and Stocks*, 74 Harv.L.Rev. 473, 505 (1961).

■ It is clear from the stipulated facts that in December 1967 National Can's subsidiary NCOC issued 7000 debentures with a face value of $1,000 at par and received from Eurodollar investors $7 million, less a brokerage commission of $175,000. National concedes that brokerage commissions are not considered in determining original issue discount. Therefore, it follows that NCOC did not incur any cost or expense in acquiring the use of capital represented by the loan made to it through issuance of the debentures. Incurrence of some cost or expense of acquiring the use of capital is essential to entitlement of original issue discount when either bonds or debentures are sold. *Chock Full O'Nuts Corporation v. United States*, 453 F.2d 300, 304 (2d Cir. 1971).

The right of the debenture holders to convert their creditor interests into National's common stock may have had the economic value now claimed by National Can; but the transaction into which NCOC entered did not involve such an allocation of value. NCOC did not undertake a separate obligation, one involving a cost or expense, with relation to the conversion privilege. Therefore, it is evident that National Can's subsidiary, National Can Overseas Corporation, did not issue its convertible debentures in 1967 at a discount.

B

■ The second issue is whether National is entitled to deduct, as amortizable bond premium under Section 171 of the 1954 Code, the difference between the fair market value of its common stock and the face value of the debentures on the date they were exchanged. The parties have stipulated that during the period 1969 through 1971, certain of the Eurodollar investors exercised their conversion rights; and National Can, as guarantor, discharged its undertaking to convert the bonds by delivering unissued, fully paid and non-assessable shares of its common stock in accordance

with the conversion privileges. This action was necessary because NCOC did not have any shares of National's common stock and thus was unable to meet its obligation to honor the investors' exercise of their conversion rights. A condition of the debentures provided that the conversion price was to be $38.50 per share, an amount that was changed to $19.25, effective June 3, 1970, by a two-for-one stock split. When National exchanged its unissued shares for the debentures, the fair market value of its stock was in excess of the conversion price. In fact, during the three-year period, this excess totaled $3,793,544.

National now claims, as it did when it sought refunds, that the excess was paid to acquire bonds at a premium, an amount amortizable under 26 U.S.C. § 171(a)(1) which provides that "[i]n the case of a bond (other than a bond the interest of which is excludable from gross income) the amount of the amortizable bond premium shall be allowed as a deduction." It concedes that although subparagraph (b) of the quoted statute contains the prohibition, "[i]n no case shall the amount of the bond premium on a convertible bond include any amount attributable to the conversion feature of the bond". National argues, however, that this provision was intended to cover only situations where bonds are convertible in the hands of a purchaser. This interpretation, according to National, is in fact reflected in Treasury Regulation 1.171–2(c)(1) which, for the purposes of Section 171, provides that the fact "a bond is convertible into stock does not, in itself, prevent the application of Section 171. A convertible bond is within the scope of such section if the option to convert on a date certain specified in the bond rests with the holder thereof." The bonds involved, as the parties have stipulated, were not convertible in the hands of National, which became a holder after the conversions. For these reasons, National concludes, and asks this court to do likewise, that Section 171(b) of 26 U.S.C. does not apply to this case, therefore making the excess in the value of the shares over the face of the debentures amortizable bond premium under 26 U.S.C. § 171(a)(1).

The United States, however, argues that the bond premium amortization provisions of 26 U.S.C. § 171(a)(1) apply only in those cases where a bond is purchased for a price in excess of face in order to enable a holder to earn a stated rate of interest greater than that prevailing on similar securities in the marketplace. Referring to language in *Commissioner v. Shoong*, 177 F.2d 131, 134 (9th Cir. 1949), *rev'd, Shoong v. Commissioner*, 339 U.S. 974, 70 S.Ct. 1019, 94 L.Ed. 1380, it insists that "[w]here a premium is paid to secure such a 'higher-than-market' rate of return, the stated rate of interest on the bond naturally will not reflect its true or effective yield." Defendant points out that promptly after the Supreme Court decided *Commissioner v. Korell*, 339 U.S. 619, 70 S.Ct. 905, 94 L.Ed. 1108 (1950), Congress, in the same year, amended the predecessor statute to Section 171 "through amendment of Section 217(a) of the Revenue Act of 1950, c. 994, 64 Stat. 106, to exclude from amortization the amount of the premium paid by a bond purchaser 'attributable to the conversion features of the bond.'" This amendment, the United States insists, expresses a clear and unequivocal intent by Congress that exchanges like the ones in which National was involved during the period 1969–1971 not be recognized as producing an amortizable premium because, whatever the result, it was "attributable to the conversion features of the bond."

This court is constrained to agree. When National Can discharged its obligations as a guarantor and exchanged its unissued common stock for the debentures, the transactions were attributable to the conversion features of the bonds which its subsidiary, NCOC, issued in 1967. The phrase "attributable to" has a normal meaning which Congress has used in a number of amendments to the Internal Revenue Code. *See, e. g.* Act of January 12, 1971, P.L. 91–677, 84 Stat. 2061. "Webster's Third International Dictionary defines one thing to be attributed to another if it is 'caused or brought about by' that other thing." *Ogden v. United States*, 432 F.Supp. 214, 216

(S.D.Miss.1975), *aff'd*, 555 F.2d 134 (5th Cir. 1977). The decision of certain Eurodollar investors to demand exchange of their bonds for National Can's unissued common stock was caused or brought about by the fact that the bonds they purchased in 1967 contained the privilege to convert. A conversion precipitated by a bondholder pursuant to a pre-existing conversion right is an act caused or brought about by the right to convert. Therefore, in this court's judgment, when during the period 1969 through 1971 certain holders of the NCOC debentures exercised their right to exchange their bonds for National's common stock, the resulting transactions were "attributable to the conversion features of the bond" within the meaning of 26 U.S.C. § 171(b).

■ This alone is sufficient to exclude from amortization by National as bond premium the excess of the value of its unissued common stock over the face value of the debentures; but in addition, there is an economic fact that precludes such a beneficial tax treatment by National of the transactions involved. Contrary to National's argument, and despite the rules governing the value of stock,[1] it did not pay $3,793,544 in excess of the face value of the debentures when it delivered, in accordance with its guarantee obligations, its unissued common stock for the NCOC debentures. Unissued stock merely represents the right to admit new stockholders, and has no value in itself. *Chicago, M., St. P. & P. R. Co. v. Harmon*, 89 Mont. 1, 295 P. 762, 767 (1931); 5 Thompson on Corporations (3d ed.) § 3445. Stock which has not been subscribed for, although authorized, is not an asset of the corporation. 18 C.J.S. Corporations § 210. A different case, and perhaps a stronger one, would have been made by National in support of its claim had treasury stock been involved. This kind, as distinguished from unissued stock, is corporate stock which has been subscribed and paid for, but has thereafter been reacquired by the corporation by purchase, donation, forfeiture, or other means. 18 Am.Jur.2d Corporations § 216; *see Bass v. Commissioner of Internal Revenue*, 129 F.2d 300, 305 (1st Cir. 1942); *cf. Christie v. Fifth Madison Corp.*, 211 N.Y. S.2d 787, 795, 13 A.D.2d 43 (1961). In this case, National merely discharged its obligations as a guarantor and delivered its own unissued shares that had a zero tax basis for debentures each worth $1,000. And of significance is the fact that National has been receiving interest payments on these bonds from its subsidiary, NCOC. It follows then, that the Internal Revenue Service was correct in rejecting National's claim of amortizable bond premiums under 26 U.S.C. § 171(a)(1).

### C

■ This being the case, the third and final issue is whether, as an alternative to amortization under Section 171(a)(1), National was entitled to deduct as ordinary and necessary business expenses the sums equal to the difference between the fair market value of the stock on the date of the exchanges (plus cash paid for fractional shares) and $1,000, the face amount of the debentures. Section 162(a) of the Code, in its pertinent part, provides that "[t]here shall be allowed as a deduction all ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business...." National argues that these provisions, if not those in Section 171, allow it to deduct in the year the

---

1. National calls attention to the principle that "[w]hen a corporation acquires property in exchange for its stock, ... the fair market value of the stock is the measure of the cost of the property." It cites in support *Moore McCormack Lines, Inc.* 44 T.C. 745, CCH Dec. 27, 538 (1965); *Black Hills Power & Light Co.*, 14 T.C. 1425, CCH Dec. 17, 726 (1950); and *Independent Oil Co., Inc.*, 6 T.C. 194, CCH Dec. 14, 960 (1946). However, a reading of these cases reveals that in each, there was, for one tax purpose or another, an issue concerning either the value of the stock or the value of the property acquired. *See MacCallum Gauge Co.*, 32 B.T.A. 544 (1935). In this case there is no controversy between the parties either as to the value of the unissued stock or the value of the debentures. And it is not true, as National seems to believe, that every time stock is exchanged for property the value of the property acquired is the market value of the stock at the time of the exchange. *See e. g. Moore McCormack Lines, Inc.* 44 T.C. 745, CCH Dec. 27, 27, 538 (1965).

debentures were exchanged the entire arithmetical difference between the face value of the bonds and the market value of the shares, as ordinary and necessary business expenses. It relies on *Roberts & Porter, Inc. v. Commissioner*, 307 F.2d 745 (7th Cir. 1962) and three cases that followed: *Universal Tractor Equipment Corp. v. United States*, 1967–1 CCH U.S.T.C. ¶ 9409, 19 A.F. T.R.2d 1337 (E.D.Va.1967); *Southwest Grease & Oil v. United States*, 308 F.Supp. 107 (D.Kan.1969), *aff'd per curiam*, 435 F.2d 675 (10th Cir. 1971); and *Head Ski Co. v. United States*, 323 F.Supp. 1383 (D.Md. 1971), *aff'd per curiam*, 454 F.2d 732 (4th Cir. 1972).

The United States meets this alternative claim with an argument that rests on two grounds. First it contends that the exchanges by National of its stock for bonds of face amounts less than the fair market value of the shares was a loss, not an expense. It points to Section 1032 of the Code which provides that in determining tax liability, "[n]o gain or loss shall be recognized to a corporation on the receipt of money or other property in exchange for stock (including treasury stock) of such corporation." Second, the United States contends that when National exchanged its unissued stock for the NCOC debentures, it merely discharged obligations it had assumed as a guarantor of the bonds; discharge of obligations pursuant to a guaranty, even where payment is involved, does not give rise to an expense or loss deduction. The United States argues that allowance of the claim National now makes would conflict with basic rules that govern the tax consequences to a guarantor of payment of a debt pursuant to a guaranty. In this court's judgment, this argument must prevail.

The phrase "ordinary and necessary expenses," found in Section 162 of the Code, implies that the expenses are reasonable and bear a proximate relation to the management of the property held for the production of income. *Northern Trust Co. v. Campbell*, 211 F.2d 251, 253 (7th Cir. 1954). In its most general acceptance, the term "expense", when used to determine

tax deductions, means money spent; disbursing of money; a drain on one's finances; or the incurring in the tax year of an obligation to pay. *Cf. United States v. Block & Kohner Mercantile Co.*, 33 F.2d 196 (E.D.Mo., 1929), *aff'd, Block & Kohner Mercantile Co. v. United States*, 37 F.2d 877 (8th Cir. 1930). It may also include the employment and consumption of time and labor. *See Matthews & Willard Mfg. Co. v. Trenton Lamp Co.*, 73 F. 212, 215 (D.N.J. 1896). Of course, there can be an expense which will qualify as a tax deduction where all other requirements are satisfied, if there is payment in kind or in the equivalent of cash. 3 Paul and Mertens, Law of Federal Income Taxation § 23.40; Mertens, Law of Federal Income Taxation § 25.10. But in this case National did not pay, disburse or spend money or its equivalent when it exchanged its unissued stock for the NCOC debentures. National does not claim employment or consumption of time and labor as a result of the exchange transactions. All it did was deliver the agreed number of its unissued shares of common stock for the debentures of a subsidiary whose obligations it had guaranteed. It is true that because of the fortuity of the market place, the shares had a selling price that made them more valuable than they were when the debentures were issued. However, conceptually, the difference arising on a corporation's exchange of stock having a fair market value greater than the face amount of a bond or debenture received is, if anything, a loss and not an expense. *Cf. International Freighting Corp. v. Commissioner*, 135 F.2d 310, 314 (2d Cir. 1943). And recognized commentators on this somewhat esoteric aspect of tax law agree with this view. *See* Fleischer and Cary, *The Taxation of Convertible Bonds and Stocks*, 74 Harv.L. Rev. 473, 496–498 (1961); Eustice, *Cancellation of Indebtedness in the Federal Income Tax: A Problem of Creeping Confusion*, 14 Tax.L.Rev. 225, 238–240 (1959).

Consequently, the United States is correct in its contention that National's exchange of its stock for bonds of face amounts less than the fair market value of the shares was a loss, not an expense. But this loss cannot be recognized for tax pur-

poses because it resulted from an exchange of corporate stock for other property; in this case, the NCOC debentures. 26 U.S.C. § 1032; *see Thalhimer Bros., Inc. v. C.I.R.,* 1969, 52 T.C. 659; *cf. H. B. Zachry Co. v. C.I.R.,* 1967, 49 T.C. 73. *Roberts & Porter,* and the three cases that followed its rationale, do not support National's claim that the exchange transactions entitle it to tax deductions under Section 162(a).[2] Each case is an example of a corporation that paid either money or the equivalent for the retirement or redemption of its outstanding notes or debentures. They represent sound applications of Section 162(a) because in each instance all the requirements for valid tax deductions were satisfied.

 The United States is also correct in its second contention. National, in its own interest, became the guarantor of its separately functioning subsidiary concerning the terms of the debentures issued in 1967. The parties have stipulated that since the debentures have been the property of National, the subsidiary has paid interest on them, pursuant to their terms. This fact supports the conclusion that the subsidiary continues to be a viable, financially responsible corporation; in other words, it is able to respond to all the obligations that flow from the relation of guarantor-guarantee created when the debentures were issued. It is well established that where a guarantor, at the request, or with the consent of, the principal obligor, discharges the obligations of the latter, the law raises an implied promise on the part of the principal to reimburse the guarantor. 38 C.J.S. Guaranty 111; *see Putnam v. Commissioner of Internal Revenue,* 352 U.S. 82, 85, 77 S.Ct. 175, 176, 1 L.Ed.2d 144 (1956). Under these circumstances, the guarantor cannot take a business or loss deduction until the taxable year in which it can show that there is no recourse against the principal obligor. *Joe Balestrieri & Co. v. Commissioner of Internal Revenue,* 177 F.2d 867, 873 (9th Cir. 1949).

## IV

For the foregoing reasons, this court concludes that (1) National's subsidiary, NCOC, did not issue its convertible debentures in 1967 at a discount thereby entitling it to amortizable discount deductions over the 20 year life of the bonds; (2) National is not entitled to deduct, as amortizable bond premium under Section 171 of the Code, the difference between the fair market value of its common stock and the face value of the debentures on the date they were exchanged; and (3) National, in the alternative, is not entitled to deduct as ordinary and necessary business expenses the sums equal to the difference between the fair market value of the stock on the date of the exchanges (plus cash paid for fractional shares) and $1,000, the face amount of the debentures. Therefore, the court finds in favor of the defendant United States and against the plaintiff National Can Corporation. The clerk is directed to enter judgment in the form required by Rule 58 of the Federal Rules of Civil Procedure, costs to follow the judgment as in the rules and statutes provided.

---

2. *Roberts & Porter, Inc. v. Commissioner,* 307 F.2d 745 (7th Cir. 1962); *Universal Tractor Equipment Corp. v. United States,* 1967–1 CCH U.S.T.C. 9409, 19 A.F.T.R.2d 1337 (E.D.Va. 1967); *Southwest Grease & Oil v. United States,* 308 F.Supp. 107 (D.Kan.1969), *aff'd per curiam,* 435 F.2d 675 (10th Cir. 1971); *Head Ski Co. v. United States,* 323 F.Supp. 1383 (D.Md.1971), *aff'd per curiam,* 454 F.2d 732 (4th Cir. 1972).